Bonner C. Walsh
bonner@walshpllc.com
Idaho State Bar Number 9646
**WALSH PLLC**
1561 Long Haul Road
Grangeville, ID 83530
Phone 541.359.2827
Facsimile 866.503.8206

Marc E. Dann
Brian D. Flick
Marita I. Ramirez
(*pro hac vice* to be submitted)
notices@dannlaw.com
**DannLaw**
15000 Madison Ave.
Lakewood, OH 44107
Phone: (216) 373-0539
Facsimile: (216) 373-0536

Thomas A. Zimmerman, Jr.
(*pro hac vice* to be submitted)
**Zimmerman Law Offices, P.C.**
77 W. Washington Street, Suite 1220
Chicago, Illinois 60602
(312) 440-0020 telephone
(312) 440-4180 facsimile
www.attorneyzim.com
firm@attorneyzim.com

*Attorneys for Plaintiffs Miles and Melissa Black and the Putative Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO
## SOUTHERN DIVISION AT BOISE

| | |
|---|---|
| **MILES BLACK and MELISSA BLACK,** individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br> v. <br><br> **IEC GROUP INC., d/b/a AMERIBEN** <br><br> Defendant. | Case No.  1:23-cv-384 <br><br> Judge <br><br> **CLASS ACTION COMPLAINT FOR DAMAGES** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiffs Miles Black, and Melissa Black, through counsel, for their *Complaint for Damages* against Defendant IEC Group Inc. d/b/a AmeriBen, state as follows:

## PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff Miles Black ("Mr. Black" or "Plaintiff") is a natural person and a citizen of Florida and resident of Hernando County, Florida.

2.      Plaintiff Melissa Black ("Mrs. Black" or "Plaintiff") is a natural person and a citizen of Florida and resident of Hernando County, Florida.

3.      Defendant IEC Group Inc. d/b/a AmeriBen is a domestic corporation headquartered in Meridian, Idaho. Its principal place of business is located in Ada County, Idaho at 2888 West Excursion Lane, Meridian, Idaho 83642.  Its registered agent is CT Corporation System, 1555 W. Shoreline Drive, Suite 100, Boise ID 83702.

4.      This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1322, as amended by the Class Action Fairness Act of 2005. Subject matter jurisdiction is proper because: 1) the amount in controversy in this class action exceeds five million dollars ($5,000,000), excluding interest and costs; 2) there are more than 100 Class members; 3) at least member of the Class is diverse from the Defendant; and 4) the Defendant is not a government entity.

5.      This Court has supplemental jurisdiction to hear any state law claims that are pleaded herein or that may subsequently arise pursuant to 28 U.S.C. § 1367.

6.      Venue lies This Court is the proper venue for this case pursuant to 28 U.S.C. § 1391(a) and (b) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District and because Defendant resides and/or is registered to do business and transact business in this District.

## SUMMARY OF CLAIMS

7.      Plaintiffs Miles Black and Melissa Black (collectively, "Plaintiffs") bring this suit on behalf of themselves and a Class of similarly situated individuals to hold Defendant accountable for the harm it caused to Plaintiffs and Class members from its failure to properly secure and safeguard customers' sensitive personally identifiable information ("PII"), including their names, sensitive financial information, and protected health information ("PHI"), such as customers' members identification numbers, healthcare provider, and health insurance information (collectively, "Sensitive Information").

8.      The full extent of the types of sensitive personal information, the scope of the breach, and the root cause of the breach is all within the exclusive control of the Defendant, its agents, counsel, and forensic security vendors at this phase of litigation.

9.      Defendant IEC Group Inc. d/b/a AmeriBen ("AmeriBen") is a third party administrator which administers employer sponsored benefit plans to its members. In providing its third party administration services, AmeriBen collects Sensitive Information from its members. With over one million members[1], AmeriBen hosts an extensive repository of Sensitive Information for its customers.

10.     Defendant expressly and impliedly promised Plaintiffs and its other customers that it will maintain the privacy and confidentiality of its members' Sensitive Information.

11.     Based on members' reasonable expectation of privacy, Defendant's express and implied promises, statutes, rules, and industry standards protecting clients' Sensitive Information, clients expect that their Sensitive Information exchanged between them and their third party administrator will remain confidential and not be shared or disclosed to third parties.

---

[1] https://services.ameriben.com/company (last visited August 24, 2023)

12.     On or about August 14, 2023, Plaintiffs each received a letter from AmeriBen, which is attached as **Exhibit A.** In the letter, Plaintiffs were informed for the first time that an AmeriBen associate exposed Plaintiffs' Sensitive Information to unauthorized access and potential misuse ("Data Breach"). The Sensitive Information included name, employer's name, a unique tracking number, healthcare provider name, claim number, date of service, and the amount billed or paid.

13.     Defendant did not adequately safeguard and protect Plaintiffs' Sensitive Information, and now Plaintiffs, along with millions of other Class Members, are the victims of a significant Data Breach that, among other harms, puts them at a substantially increased risk of identity fraud, which will negatively impact them for years.

14.     Defendant is responsible for this Data Breach through its failure to implement and maintain adequate and reasonable data security safeguards, its failure to comply with industry-standard data security practices, and its failure to comply with federal and state laws and regulations governing data security and privacy of PII and PHI.

15.     Defendant had numerous statutory, regulatory, and common law duties to Plaintiffs and Class Members to keep their Sensitive Information confidential, safe, secure, and protected from unauthorized disclosure or access, including duties under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). Defendant was and still is required to maintain the security and privacy of the Sensitive Information entrusted to them. When Plaintiffs and Class Members provided their Sensitive Information, Defendant and its agents were required to comply with these obligations to keep Plaintiffs' Sensitive Information secure and safe from unauthorized access, to use this information for business purposes only, and to make only authorized disclosures of this information.

16.     In this era of frequent data security attacks and data breaches, particularly in the healthcare industry, Defendant's failures leading to the Data Breach are particularly egregious.

17.     Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their PII and PHI.

18.     As a result of Defendant's failures, the PII and PHI of Plaintiffs and Class Members were exposed to malicious and criminal actors. As a direct and proximate result, Plaintiffs and Class Members are now at a significant present and future risk of identity theft, financial fraud, and/or other identity-theft or fraud, imminently and for years to come.

19.     Plaintiffs and Class Members have suffered numerous actual and imminent injuries as a direct result of the Data Breach, including: (a) theft of their valuable PII and PHI; (b) costs associated with the detection and prevention of identity theft; (c) costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the consequences of the Data Breach; (d) the actual and/or imminent injury arising from actual and/or potential fraud and identity theft posed by their personal data being placed in the hands of ill-intentioned hackers and/or criminals; (e) damages to and diminution in value of their personal data; (f) invasion of privacy; (g) actual damages in the form of the difference in value between the services that should have been delivered and the services that were actually delivered; and (h) the continued risk to their PII and PHI, which remains in the possession of Defendant, and which is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' PII and PHI.

20.     Plaintiffs seek to remedy these harms, and to prevent their future occurrence, on behalf of themselves and all similarly situated persons whose PII and PHI were compromised as a result of the Data Breach.

## FACTUAL BACKGROUND

**A.      Defendant Collected, Maintained, and Stored Sensitive Information.**

21.      Employers contract with AmeriBen to provide an allegedly more efficient process by which employees may obtain health insurance and process claims. According to AmeriBen, it serves over 160 employer groups and administers benefits to millions of members.[2]

22.      In providing its third party administration services, AmeriBen collects Sensitive Information from its members. This information includes name, email address, username, password, social security number, phone number, mailing address, financial information and history, employment information, drivers' license information, insurance information, marital status, and other personal and highly sensitive personal information a person might provide when enrolling in an employer sponsored benefit plan.

23.      By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and the Class Members' PII and PHI, Defendant assumed legal and equitable duties to those individuals and knew or should have known that they were responsible for protecting Plaintiffs' and Class Members' PII and PHI from disclosure.

24.      Plaintiffs and the Class Members have taken reasonable steps to maintain the confidentiality of their PII and PHI. Defendant was required to keep Plaintiffs' and Class Members' PII and PHI confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

**B.      The Data Breach**

25.      On July 12, 2023, AmeriBen learned that on December 6, 2022, an AmeriBen associate attached an Excel spreadsheet in an email to one or more members which contained

---

[2] https://services.ameriben.com/company (last visited August 24, 2023)

portions of a claims report. While the spreadsheet was reportedly "filtered" when it was sent out, AmeriBen discovered that it was possible to "unfilter" the spreadsheet which would reveal the information of other members contained in the claims report.

26.     Defendant began notifying the individual victims of the Data Breach in August 2023. Plaintiffs each received Data Breach notice letters from AmeriBen, dated August 14, 2023, notifying them of the Data Breach.

27.     The letters detailed the circumstances of the Data Breach mentioned above and further encouraged Plaintiffs and Class Members to contact them as soon as possible if "you notice anything in your health records or explanation of benefits (EBOs) that doesn't look right."

28.     The Data Breach notice does not address any compensation for the unauthorized release and disclosure of Plaintiffs' and Class Members' PII and PHI, including private and sensitive medical information.

29.     While the letters advised Plaintiffs and Class Members to "monitor [their] credit reports," and further advised that Plaintiffs' and Class Members had had the right to obtain "one free credit report annually from each of the three major credit reporting bureaus," Defendant did not offer to pay costs associated with Plaintiffs obtaining more than "one free credit report annually[.]"

30.     This is wholly inadequate because victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft. Furthermore, Defendant's providing information on how to sign up for free credit monitoring squarely places the burden on Plaintiffs and Class Members, rather than Defendant, to investigate and protect themselves from Defendant's tortious acts resulting in the Data Breach. Rather than automatically enrolling Plaintiffs and Class Members in credit monitoring services upon discovery of the Data Breach,

Defendant merely sent instructions "offering" the services to affected patients recommending they sign up for the services.

31.     The Data Breach notices also advised Plaintiffs and Class Members of their right to obtain a security freeze on their respective credit reports. However, it acknowledged that "using a credit freeze to take control over who gets access to the personal and financial information in your credit report may delay, interfere with, or prohibit the timely approval of any subsequent request or application you make regarding a new loan, credit, mortgage, or any other account involving the extension of credit."

32.     Based on Defendant's urging Plaintiffs and Class Members to take these mitigating actions immediately, it is abundantly clear that the perils from the Data Breach are real and concrete, and not hypothetical or attenuated.

33.     Despite all of the publicly available knowledge of the continued compromises of PII and PHI, Defendant's approach to maintaining the privacy of Plaintiffs' and Class Members' PII and PHI was inadequate, unreasonable, reckless, and negligent. This is evidenced by Defendant's Data Breach notice, in which Defendant stated in response to the Data Breach that they "are taking steps to reduce the risk of this happening again." Implied in Defendant's statement is an admission that Defendant's technical and cybersecurity capabilities were inadequate, which resulted in the Data Breach and the divulgence of Plaintiffs' and Class Members' PII and PHI.

### C.  Defendant Knew They Needed to Protect Customers' Sensitive Personal Information

34.     Defendant is fully aware of how sensitive the PII and PHI they store and maintain is. They are also aware of how much PII and PHI they collect, use, and maintain from Plaintiffs' and Class Members.

35.     Businesses that store personal information are likely to be targeted by cyber criminals. Credit card and bank account numbers are tempting targets for hackers, but credit and debit cards can be canceled, quickly mitigating the hackers' ability to cause further harm. Instead, PHI and types of PII that cannot be easily changed (such as dates of birth and Social Security numbers) are the most valuable to hackers.[3]

36.     Defendant knew or should have known that they were ideal targets for hackers and others with nefarious purposes related to sensitive personal identifying and health information. AmeriBen processed and saved multiple types, and many levels, of PII and PHI through its computer data and storage systems.

37.     Indeed, the Federal Bureau of Investigation ("FBI") has expressed concerns about data security in the healthcare industry. In August 2014, after a cyberattack on Community Health Systems, Inc., the FBI warned companies within the healthcare industry, like Defendant, that hackers were targeting them. The warning stated that "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining the Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PHI)."[4]

38.     The healthcare sector reported the second largest number of breaches among all measured sectors in 2018, with the highest rate of exposure per breach.[5]

---

[3] Calculating the Value of a Data Breach – What Are the Most Valuable Files to a Hacker? Donnellon McCarthy Enters. (July 21, 2020), https://www.dme.us.com/2020/07/21/calculatingthe-value-of-a-data-breach-what-are-the-most-valuable-files-to-a-hacker/. (last visited August 24, 2023)
[4] Jim Finkle, FBI warns healthcare firms that they are targeted by hackers, REUTERS (Aug. 2014), https://www.reuters.com/article/us-cybersecurity-healthcare-fbi/fbi-warnshealthcare-firms-they-are-targeted-by-hackers-idUSKBN0GK24U20140820, (last visited August 24, 2023)
[5] Identity Theft Resource Center, 2018 End-of-Year Data Breach Report, https://www.idtheftcenter.org/wp-content/uploads/2019/02/ITRC_2018-End-of-Year-Aftermath_FINAL_V2_combinedWEB.pdf, (last visited Aug. 24, 2023)

39.     Healthcare related breaches have continued to rapidly increase because electronic patient data is seen as a valuable asset. According to the 2019 HIMSS Cybersecurity Survey, 82% of participating hospital information security leaders reported having a significant security incident in the last 12 months, with a majority of these known incidents being caused by "bad actors" such as cybercriminals.[6] "Hospitals have emerged as a primary target because they sit on a gold mine of sensitive personally identifiable information for thousands of patients at any given time. From social security and insurance policies, to next of kin and credit cards, no other organization, including credit bureaus, have so much monetizable information stored in their data centers."[7]

40.     As major healthcare service administrator, Defendant knew, or should have known, the importance of safeguarding the patients' PII and PHI entrusted to it and of the foreseeable consequences if that data was disclosed. Defendant failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

41.     By requiring the production of, collecting, obtaining, using, and deriving benefits from Plaintiffs' and Class Members' PII and PHI, Defendant assumed certain legal and equitable duties, and they knew or should have known that they were responsible for the diligent protection of that PII and PHI they collected and stored.

42.     Defendant's notification letters acknowledge the importance of data security and its duty to Class Members, stating: "We're committed to protecting the privacy and security of your protected health information ("PHI")."

---

[6] 2019 HIMSS Cybersecurity Survey, https://www.himss.org/sites/hde/files/d7/u132196/2019_HIMSS_Cybersecurity_Survey_Final_Report.pdf (last visited Aug. 24, 2023)
[7] Eyal Benishti, How to Safeguard Hospital Data from Email Spoofing Attacks, Chief Healthcare Executive (Apr. 4, 2019), https://www.chiefhealthcareexecutive.com/view/how-to-safeguardhospital-data-from-email-spoofing-attacks, (last visited Aug. 24, 2023)

43.     Defendant has the resources and responsibility to invest in the necessary data security and protection measures. Yet, Defendant failed to undertake adequate analyses and testing of its own systems and other data security measures to avoid the failures that resulted in the Data Breach.

44.     The seriousness with which Defendant should have taken its data security is shown by the number of data breaches perpetrated in the healthcare, banking, and retail industries over the past few years.

45.     Protenus, a healthcare compliance analytics firm, analyzed data breach incidents disclosed to the U.S. Department of Health and Human Services or the media during 2019, finding that there has been an alarming increase in the number of data breaches of patient privacy since 2016, when there were 450 security incidents involving patient data.[8] In 2019 that number jumped to 572 incidents, which is likely an underestimate. There continues to be on average at least one health data breach every day.[9]

## D.     Value of the Stolen Data

46.     Stolen PII and PHI are valuable commodities to identity thieves.  The purpose of stealing large blocks of Sensitive Information, like in this Data Breach, is to use the data for illicit purposes or to sell the data for profit to other criminals who buy the data and misuse it.

47.     Medical data has particular value on the black market because it often contains all of an individual's Sensitive Information, as opposed to a single marker that may be found in a more benign data breach.

---

[8] Heather Landi, Number of patient records breached nearly triples in 2019, FIERCE HEALTHCARE (Feb. 20, 2020), https://www.fiercehealthcare.com/tech/number-patient-recordsbreached-2019-almost-tripled-from-2018-as-healthcare-faces-new-threats, (last visited Aug. 24, 2023)
[9] *Id*.

48.     According to a Trustware report, a healthcare data record may be valued up to $250 per record on the black market compared to $5.40 for the next highest value (a payment card).[10]

49.     Healthcare related data is among the most sensitive and personally consequential when compromised.  "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery" reported Pam Dixon, executive director of World Privacy Forum.[11] A report focusing on health care breaches found that the "average total cost to resolve an identity theft related incident came to about $20,000."[12]

50.     Medical information is some of the highest value data.[13] In fact, according to the FBI's Cyber Division, healthcare records can be sold by criminals for 50 times the price of stolen Social Security numbers or credit card numbers. By one estimate, PHI can sell for as much as $363 according to the Infosec Institute.[14] And files containing PHI can be bought on the black market for between $1,200 and $1,300 each.[15]

---

[10]https://www.securelink.com/blog/healthcare-data-new-prize-hackers                     citing https://trustwave.azureedge.net/media/16096/2019-trustwave-global-security-report.pdf?rnd=132056250120000000. (last visited Aug. 24, 2023).
[11] Michael Ollove, "The Rise of Medical Identity Theft in Healthcare," Kaiser Health News (Feb. 7 2014), https://khn.org/news/rise-of-indentity-theft/ (last visited Aug. 24, 2023).
[12] Elinor Mills, Study: Medical Identity theft is costly for victims, CNET (Mar.3, 2010) https://www.cnet.com/tech/services-and-software/study-medical-identity-theft-is-costly-for-victims/ (last visited Aug. 24, 2023).
[13] Calculating the Value of a Data Breach -What are the Most Valuable Files to a Hacker" Donnellon McCarhty Enters (July 21, 2020) https://www.dme.us.com/2020/07/21/calculating-the-value-of-a-data-breach-what-are-the-most-valuable-files-to-a-hacker/ (last visited Aug. 24, 2023).
[14] Data Breaches: In the Health Care Sector, Center for Internet Security, https://www.cisecurity.org/blog/data-breaches-in-the-healthcare-sector/ (last visited Aug. 24, 2023).
[15] Elizabeth Clarke, Hackers Sell Health Insurance Credentials, Bank Accounts, SSNs, and Counterfeit Documents Secure Works (July 15, 2013), https://www.secureworks.com/blog/general-hackers-sell-health-insurance-credentials-bank-accounts-ssns-and-counterfeit-documents (last visited Aug. 24, 2023).

51.     Thus, the compromised PII and PHI of Plaintiffs and Class members have a high value in both legitimate and black markets.   And Plaintiffs and class members have now lost the economic value of their PII and PHI.

**E.     The Breach Justifies Reasonable Mitigation Efforts**

52.     It is well recognized that in data breaches fraudulent activity may not show up for prolonged periods of time -potentially years after PHI and PII are divulged to third party criminals. By some accounts, forty percent of consumers discovered they were victims of medical identity theft only after they received collection letters from creditors for expenses incurred in their names.[16]

53.     Here, not only was sensitive medical information divulged but also health insurance information, dates of birth, addresses, and names.   While it is unknown whether social security numbers were involved, social security numbers are not necessary for medical or financial identity theft with the PHI and PII that is known to have been disclosed in this case.

54.     Despite Defendant's failure to protect Plaintiffs' and Class members' PII and PHI, AmeriBen has not offered Plaintiffs or Class members any recourse. The Notice Letter only addresses potential financial fraud but is practically useless for addressing the risk of medical identity fraud, which is also at heightened risk due to the type of information at issue in this Breach.

55.     Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their Sensitive Information. Plaintiffs and Class Members, as current and former customers, and current and former employees, relied on Defendant to keep their Sensitive

---

[16] The Potential Damages and Consequences of Medical Identity Theft and Healthcare Data Breaches, Experian (Apr. 2010) https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf (last visited Aug. 24, 2023).

Information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosure of this information.

56.     In an effort to mitigate the risk and potential losses, Plaintiffs have spent time reviewing bank accounts and insurance information looking for suspicious activity, researching the Breach, and otherwise spending time on this Data Breach.  Plaintiffs will continue to spend time each week monitoring accounts in the future and remain at risk for future identity theft (financial and medical).  These efforts are reasonable in light of the current and future risk of identity theft.

57.     These efforts are also in line with FTC recommendations.  The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (or an extended fraud alert that lasts for seven years if they learn someone has abused their information), reviewing their credit reports, contacting companies to dispute fraudulent charges on accounts, placing a credit freeze on their credit, and correcting their credit reports.[17]

## F.     Defendant's Conduct Violates HIPAA and Industry Standard Data Security Practices

58.     Title II of HIPAA contains what are known as the Administrative Simplification provisions. 42 U.S.C. §§ 1301, et seq. These provisions require, among other things, that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling PHI like the data left unguarded. The HHS has subsequently promulgated five rules under authority of the Administrative Simplification provisions of HIPAA.

---

[17] *See* https://www.identitytheft.gov/Steps (last visited Aug. 24, 2023).

59.     The Data Breach resulted from a combination of insufficiencies that indicate Defendant's failed to comply with safeguards mandated by HIPAA regulations and industry standards. The security failures include, but are not limited to:

a.   Failing to maintain an adequate data security system to prevent data loss;

b.   Failing to mitigate the risks of a data breach and loss of data;

c.   Failing to adequately catalog the location of Plaintiffs' and Class Members' digital information;

d.   Failing to properly encrypt Plaintiffs' and Class Members' PHI;

e.   Failing to ensure the confidentiality and integrity of electronic PHI Defendant create, receive, maintain, and transmit in violation of 45 C.F.R. § 164.306(a)(1);

f.   Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

g.   Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

h.   Failing to identify and respond to suspected or known security incidents; mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. § 164.308(a)(6)(ii);

i.    Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

j.   Failing to protect against any reasonably-anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

k.   Failing to ensure compliance with HIPAA security standard rules by its workforce in violation of 45 C.F.R. § 164.306(a)(94);

l.   Impermissibly and improperly using and disclosing PHI that is and remains accessible to unauthorized persons in violation of 45 C.F.R. § 164.502, et seq.;

m.   Failing to effectively train all members of its workforce (including independent contractors) on the policies and procedures with respect to PHI as necessary and appropriate for the members of its workforce to carry out their functions and to maintain security of PHI in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5); and

n.   Failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard PHI, in compliance with 45 C.F.R. § 164.530(c).

**G.    FTC Guidelines & Violations**

60.    The Defendant also failed to comply with Federal Trade Commission ("FTC") guidelines.

61.    The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices.  In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cybersecurity guidelines for businesses.  The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no

longer needed for authorized purposes; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[18]

62.     The FTC further recommends that companies not maintain PII and PHI longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords; use industry tested methods for security; monitor for suspicious activity on the network; and verify that third party providers, such as Bricker, have implemented reasonable security measures.[19]

**H.     Defendant Acknowledges the Harm this Data Breach Has and Will Cause the Victims**

63.     It is highly probable that the criminal(s) that breached Defendant's systems and acquired Plaintiffs' and Class Members' PII and PHI did so for the purpose of using that data to commit fraud, theft, and other crimes, or for the purpose of selling or providing the PII and PHI to other individuals intending to commit fraud, theft, and other crimes.

64.     Given that this is the reason such PII and PHI are sought by criminals, it is similarly probable that Plaintiffs and Class Members have already suffered injury and face a substantial risk for imminent and certainly impending future injury.

65.     Defendant acknowledged the risk of fraud, theft, and other crimes faced by victims of the Data Breach in its notices to Plaintiffs and Class Members.

---

[18] Federal Trade Commission, Protecting Personal Information: A Guide for Business, available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Aug. 24, 2023).

[19] Federal Trade Commission, Start With Security, available at: https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited Aug. 24, 2023).

66.     According to the Federal Trade Commission ("FTC"), identity theft wreaks havoc on consumers' finances, credit history, and reputation and can take time, money, and patience to resolve.[20] Identity thieves use stolen personal information for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank and finance fraud.[21]

67.     The physical, emotional, and social toll suffered (in addition to the financial toll) by identity theft victims cannot be understated.[22] "A 2016 Identity Theft Resource Center survey of identity theft victims sheds light on the prevalence of this emotional suffering caused by identity theft: 74 percent of respondents reported feeling stressed[,] 69 percent reported feelings of fear related to personal financial safety[,] 60 percent reported anxiety[,] 42 percent reported fearing for the financial security of family members[, and] 8 percent reported feeling suicidal."[23]

68.     More recently, the FTC released an updated publication on protecting PII for businesses, which includes instructions on protecting PII, properly disposing of PII, understanding network vulnerabilities, implementing policies to correct security problems, using intrusion detection programs, monitoring data traffic, and having in place a response plan.

---

[20] See Taking Charge, What to Do If Your Identity is Stolen, FTC, 3 (Apr. 2013), https://www.justice.gov/usao-wdmi/file/764151/download, (last visited Aug. 24, 2023).

[21] See id. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 16 C.F.R. §603.2(a). The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 16 C.F.R. §603.2(b).

[22] Alison Grace Johansen, 4 Lasting Effects of Identity Theft, NortonLifeLock (Mar. 13, 2018), https://www.lifelock.com/learn-identity-theft-resources-lasting-effects-of-identity-theft.html. (last visited Aug. 24, 2023).

[23] Id. (citing Identity Theft: The Aftermath 2016™, Identity Theft Resource Center (2016) https://www.idtheftcenter.org/images/page-docs/AftermathFinal_2016.pdf (last visited Aug. 24, 2023).

69.     The FTC has, upon information and belief, brought enforcement actions against businesses for failing to protect consumers' PII and PHI. The FTC has done this by treating a failure to employ reasonable measures to protect against unauthorized access to PII and PHI as a violation of the FTC Act, 15 U.S.C. § 45.

70.     Identity thieves may commit various types of crimes such as, inter alia, immigration fraud, obtaining a driver's license or identification card in the victim's name but with another's picture, fraudulently obtaining medical services, and/or using the victim's information to obtain a fraudulent tax refund.

71.     The United States government and privacy experts acknowledge that it may take much time for identity theft to come to light and be detected because identity thieves may wait years before using the stolen data.

72.     Because the information Defendant allowed to be compromised and taken is of such a durable and permanent quality (i.e., names, Social Security numbers, dates of birth, and PHI), the harms to Plaintiffs and the Class will continue and increase, and Plaintiffs and the Class will continue to be at substantial risk for further imminent and future harm.

## I.     Plaintiffs and Class Members Suffered Long-Lasting Damages

73.     The ramifications of Defendant's failure to keep Plaintiffs' and Class Members' PII and PHI secure are long lasting and severe. Once PII and PHI are stolen, fraudulent use of that information and damage to victims may continue for years.

74.     Fraudulent activity might not show up for prolonged periods of time—potentially years after the PII and PHI are divulged to unauthorized third parties. Criminals often trade stolen PII and PHI on the "cyber black-market" for years following a breach. Cybercriminals can post stolen PHI on the internet, thereby making such information publicly available. These

cybercriminals and other unauthorized third parties are now free to exploit and misuse that PII and PHI without any ability for Plaintiffs and Class Members to recapture and erase the PII and PHI from further dissemination. Plaintiffs' and Class Members' PII and PHI is forever compromised, and this PII and PHI were unique to the information that Defendant inadequately and improperly safeguarded.

75.     Approximately 21% of victims do not realize their identity has been compromised until more than two years after it has happened.[24] This gives thieves ample time to seek multiple treatments under the victim's name. Forty percent of consumers found out they were a victim of medical identity theft only when they received collection letters from creditors for expenses that were incurred in their names.[25]

76.     Healthcare related data is among the most sensitive and personally consequential when compromised. A report focusing on health-care breaches found that the "average total cost to resolve an identity theft-related incident…came to about $20,000."[26] Further, a majority of the victims were forced to pay out-of-pocket costs for health care they did not receive in order to restore coverage. Moreover, almost 50% of the victims lost their health care coverage as a result of the incident, while nearly one-third said their insurance premiums went up after the event. Forty percent of the victims were never able to resolve their identity theft at all. Indeed, data breaches

---

[24] See Donna Parent, Medical ID Theft Checklist, IDENTITYFORCE (May 18, 2019), https://www.identityforce.com/blog/medical-id-theft-checklist-2. (last visited Aug. 24, 2023).
[25] The Potential Damages and Consequences of Medical Identity Theft and Healthcare Data Breaches, EXPERIAN (Apr. 2010), https://www.experian.com/assets/data-breach/whitepapers/consequences-medical-id-theft-healthcare.pdf. (last visited Aug. 24, 2023).
[26] Elinor Mills, Study: Medical identity theft is costly for victims, CNET (Mar. 3, 2010) https://www.cnet.com/tech/services-and-software/study-medical-identity-theft-is-costly-forvictims/. (last visited Aug. 24, 2023).

and identity theft have a crippling effect on individuals and detrimentally impact the entire economy as a whole.[27]

77.    As the FTC recognizes, identity thieves can use this PHI to commit an array of crimes including identity theft, and medical and financial fraud. Medical identity theft can result in inaccuracies in medical records and costly false claims. It can also have life-threatening consequences. If a victim's health information is mixed with other records, it can lead to misdiagnosis or mistreatment. "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[28]

78.    The PII and PHI belonging to Plaintiffs and Class Members is private and sensitive in nature and was left inadequately protected by Defendant who did not obtain Plaintiffs' or Class Members' consent to disclose their PII and PHI to any other person as required by applicable law and industry standards. The Data Breach was a direct and proximate result of Defendant's failure to: (a) properly safeguard and protect Plaintiffs' and Class Members' PII and PHI from unauthorized access, use, and disclosure, as required by various state and federal regulations, industry practices, and the common law; (b) establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiffs' and Class

---

[27] *Id.*
[28] Michael Ollove, "The Rise of Medical Identity Theft in Healthcare," KAISER HEALTH NEWS,
(Feb. 7, 2014), https://khn.org/news/rise-of-indentity-theft/. (last visited Aug. 24, 2023).

Members' PII and PHI; and (c) protect against reasonably foreseeable threats to the security or integrity of such information.

79.     Had Defendant remedied the deficiencies in its data security system and adopted security measures and protocols recommended by experts in the field, and had Defendant not been negligent, Defendant would have prevented the intrusion and, ultimately, the theft of Plaintiffs' and Class Members' PII and PHI.

80.     PHH has numerous consumer complaints lodged against it nationally on the CFPB's consumer complaint database. Each such complaint is filed and cataloged in the CFPB's publicly accessible online database which can be accessed at the following link: http://www.consumerfinance.gov/data-research/consumer-complaints.

81.     As a direct and proximate result of Defendant's wrongful actions and inaction, Plaintiffs and Class Members have been placed at an imminent, immediate, and continuing increased risk of harm from identity theft and identity fraud, requiring them to take the time which they otherwise would have dedicated to other life demands such as work and family in an effort to mitigate the actual and potential impact of the Data Breach on their lives. The U.S. Department of Justice's Bureau of Justice Statistics found that "among victims who had personal information used for fraudulent purposes, 29% spent a month or more resolving problems" and that "[resolving the problems caused by identity theft [could] take more than a year for some victims."[29]

82.     As a result of the Defendant's failure to prevent the Data Breach, Plaintiffs and Class Members have suffered, will suffer, or are at increased risk of suffering:

       a.   The compromise, publication, theft and/or unauthorized use of their PII and PHI;

_____

[29]  Erika Harrell, Ph.D. and Lynn Langton, Ph.D., Victims of Identity Theft, 2012, DOJ, Off. of Just. Programs, Bureau of Just. Statistics (Dec. 2013), https://www.bjs.gov/content/pub/pdf/vit12.pdf. (last visited Aug. 24, 2023).

b.  Unauthorized use and misuse of their PII and PHI;

c.  The loss of the opportunity to control how their PII and PHI are used;

d.  Out-of-pocket costs associated with the prevention, detection, recovery and remediation from identity theft or fraud;

e.  Lost opportunity costs and lost wages and time associated with efforts expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest and recover from identity theft and fraud;

f.  The imminent and certain impending injury flowing from potential fraud and identity theft posed by their PII and PHI being placed in the hands of criminals;

g.  The continued risk to their PII and PHI that is subject to further breaches so long as Defendant fails to undertake appropriate measures to protect the PII and PHI in Defendant's possession; and

h.  Current and future costs in terms of time, effort and money that will be expended to prevent, detect, contest, remediate and repair the impact of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

83.  In addition to a remedy for the economic harm, Plaintiffs and the Class maintain an undeniable and continuing interest in ensuring that their PII and PHI that remains in the possession of Defendant is secure, remains secure, and is not subject to further theft.

**ALLEGATIONS AS TO PLAINTIFF MELISSA BLACK**

84.  Plaintiff Melissa Black ("Mrs. Black") has had a health plan administered by the Defendant since at least April 12, 2022. As a condition of the plan administration, Mrs. Black has

provided her PHI and PII to the Defendant which was then entered in the Defendant's various databases.

85.     Based upon Exhibit A, Mrs. Black's PHI and PII was shared by the Defendant with unknown third parties for purposes of which she had no knowledge until she received this Notice.

86.     Mrs. Black greatly values her PHI and PII, especially when it comes to protecting her health care information.  Prior to the Data Breach, she took reasonable steps to maintain the confidentiality of her PII and to protect her PHI.

87.     On or about August 22, 2023, Mrs. Black received Exhibit A.  Exhibit A stated that "...We discovered that it is possible to unfilter the spreadsheet.  If the spreadsheet was unfiltered, *it would reveal the information of other members contained in the claims report, including you…The personal information that may have been disclosed included your first and last name…a unique tracking ("cert") number, provider name, claim number, date of service…".  See* Exhibit A at p. 3

88.     Recognizing the present, immediate, and substantially increased risk of harm that Mrs. Black faces, Defendant advised her to obtain either a fraud alert or credit freeze on her credit reports. *Id.* at p. 2.

89.     After receiving this Notice, Mrs. Black spent at least two hours checking her bank statements and financial accounts and has changed at least one password to those accounts.

90.     In addition to reviewing her financial accounts, Mrs. Black has experienced a rise in spam texts, spam calls, and spam emails since April 2023.

91.     The Data Breach has caused Mrs. Black to suffer fear, anxiety, and stress which has been compounded by the fact that Defendant has not been forthright with information about the Breach.

92.    Mrs. Black plans on taking additional time-consuming, necessary steps to help mitigate the harm caused by the Data Breach, including continually reviewing her depository, credit, and other accounts for any unauthorized activity.

93.    Additionally, Mrs. Black is very careful about sharing her PII. She has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

94.    Mrs. Black stores any documents containing her PII in a safe and secure location or destroys the documents. Moreover, she diligently chooses unique usernames and passwords for her various online accounts.

95.    Mrs. Black has a continuing interest in ensuring that her PII, which, upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

## ALLEGATIONS AS TO PLAINTIFF MILES BLACK

96.    Plaintiff Miles Black ("Mr. Black") has had a health plan administered by the Defendant since at least April 12, 2022. As a condition of the plan administration, Mr. Black has provided his PHI and PII to the Defendant which was then entered in the Defendant's various databases.

97.    Based upon Exhibit A, Mr. Black's PHI and PII was shared by the Defendant with unknown third parties for purposes of which he had no knowledge until he received this Notice.

98.    Mr. Black greatly values his PHI and PII, especially when it comes to protecting his health care information.  Prior to the Data Breach, he took reasonable steps to maintain the confidentiality of his PII and to protect his PHI.

99.    On or about August 22, 2023, Mr. Black received Exhibit A.  Exhibit A stated that "...We discovered that it is possible to unfilter the spreadsheet.  If the spreadsheet was unfiltered,

*it would reveal the information of other members contained in the claims report, including you…The personal information that may have been disclosed included your first and last name…a unique tracking ("cert") number, provider name, claim number, date of service…".* *See* Exhibit A at p. 1

100.    Recognizing the present, immediate, and substantially increased risk of harm that Mr. Black faces, Defendant advised him to obtain either a fraud alert or credit freeze on her credit reports. *Id.* at p. 2.

101.    After receiving this Notice, Mr. Black spent at least two hours checking his bank statements and financial accounts and has changed at least one password to those accounts.

102.    Since the Breach, Mr. Black has noticed an increase in spam messages in the form of spam calls and emails.

103.    The Data Breach has caused Mr. Black to suffer fear, anxiety, and stress which has been compounded by the fact that Defendant has not been forthright with information about the Breach.

104.    Mr. Black plans on taking additional time-consuming, necessary steps to help mitigate the harm caused by the Data Breach, including continually reviewing his depository, credit, and other accounts for any unauthorized activity.

105.    Additionally, Mr. Black is very careful about sharing his PII. He has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

106.    Mr. Black stores any documents containing his PII in a safe and secure location or destroys the documents. Moreover, he diligently chooses unique usernames and passwords for his various online accounts.

107.    Mr. Black has a continuing interest in ensuring that his PII, which, upon

information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

## CLASS ALLEGATIONS

108.    Plaintiffs bring this action on behalf of themselves and all other similarly situated Class members pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure and seek certification of the following Nationwide Class:

> **All persons who reside in the United States whose PII and PHI were accessed and divulged by the Data Breach.**

109.    In addition, Plaintiffs Miles Black and Melissa Black bring this action on behalf of themselves and all other similarly situated Class members pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure and seek certification of the following Florida Sub-Class:

> **All Florida residents whose PII was subjected to or otherwise compromised by the Data Breach.**

110.    Excluded from the class are Defendant and its subsidiaries and affiliates; all persons who make a timely election to be excluded from the class; government entities; and the judge to whom this case is assigned and his/her immediate family and court staff.

111.    Plaintiffs reserve the right to, after conducting discovery, modify, expand, or amend the above Class definition or to seek certification of a class or Classes defined differently than above before any court determines whether certification is appropriate.

112.    **Numerosity**. Consistent with Rule 23(a)(1), the members of the Class are so numerous and geographically dispersed that joinder of all Class members is impracticable. Plaintiffs believe that there are thousands of members of the Class, if not more. The number of impacted individuals remains unknown and unreported, and Plaintiffs believe additional entities and persons may have been affected by the Data Breach. The precise number of class members,

however, is unknown to Plaintiffs. Class members may be identified through objective means. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

113.    **Commonality and Predominance.** Consistent with Fed. R. Civ. P. 23(a)(2) and with 23(b)(3)'s commonality and predominance requirements, this action involves common questions of law and fact which predominate over any questions affecting individual Class members. These common questions include, without limitation:

  a.  Whether Defendant knew or should have known that its data environment and cybersecurity measures, or those created by corporate service providers, created a risk of a data breach;

  b.  Whether Defendant controlled and took responsibility for protecting Plaintiffs' and the Class's data when they solicited that data, collected it, stored it on its servers, and authorized a third party to collect and store that data;

  c.  Whether Defendant's security measures were reasonable considering the FTC data security recommendations, state laws and guidelines, industry standards, and common recommendations made by data security experts;

  d.  Whether Defendant owed Plaintiffs and the Class a duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the PII it collected, stored, and maintained from Plaintiffs and Class members;

  e.  Whether Defendant's failure to adequately secure Plaintiffs' and the Class' data constitutes a breach of its duty to institute reasonable security measures;

f.   Whether Defendant's failure to implement reasonable data security measures allowed the breach of its data systems to occur and caused the theft of Plaintiffs' and the Class' data;

g.   Whether reasonable security measures known and recommended by the data security community could have prevented the breach;

h.   Whether Plaintiffs and the Class were injured and suffered damages or other losses because of Defendant's failure to reasonably protect its data systems; and

i.   Whether Plaintiffs and the Class are entitled to damages and/or equitable relief.

114.   **Typicality**. Consistent with Fed. R. Civ. P. 23(a)(3), Plaintiffs are typical members of the Class. Plaintiffs and the Class are each a person who provided data to AmeriBen, whose data resided on AmeriBen's servers, and whose personally identifying information was exposed in Defendant's Data Breach. Plaintiffs' injuries are similar to other class members and Plaintiffs seek relief consistent with the relief due to the Class.

115.   **Adequacy**. Consistent with Fed. R. Civ. P. 23(a)(4), Plaintiffs are adequate representatives of the Class because Plaintiffs are members of the Class and are committed to pursuing this matter against Defendant to obtain relief for themselves and for the Class. Plaintiffs have no conflicts of interest with the Class. Plaintiffs have also retained counsel competent and experienced in complex class action litigation of this type, having previously litigated data breach cases. Plaintiffs intend to vigorously prosecute this case and will fairly and adequately protect the Class's interests.

116.   **Superiority**. Consistent with Fed. R. Civ. P 23(b)(3), class action litigation is superior to any other available means for the fair and efficient adjudication of this controversy. Individual litigation by each Class member would strain the court system because of the numerous

members of the Class. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court. A class action would also permit customers to recover even if their damages are small as compared to the burden and expense of litigation, a quintessential purpose of the class action mechanism.

117. **Injunctive and Declaratory Relief**. Consistent with Fed. R. Civ. P. 23(b)(2), Defendant, through its conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the class as a whole.

## LEGAL CLAIMS

### COUNT I
### Negligence

118. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

119. Defendant collected, stored, used, and benefited from the nonpublic PII and PHI of Plaintiffs and Class Members in the procurement and provision of medical service benefits for Plaintiffs and Class Members.

120. Defendant had full knowledge of the sensitivity of the PII and PHI and the types of harm that Plaintiffs and Class Members could and would suffer if the PII and PHI were wrongfully disclosed.

121. By collecting, storing, and using Plaintiffs' and Class Members' PII and PHI, Defendant owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, securing, deleting, protecting, and safeguarding the sensitive PII and PHI. Defendant owed a duty

to prevent the PII and PHI they received from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

122.    Defendant was required to prevent foreseeable harm to Plaintiffs and Class Members, and therefore had a duty to take adequate and reasonable steps to safeguard their sensitive PII and PHI from unauthorized release or theft. This duty included: (1) designing, maintaining, and testing its data security systems, data storage architecture, and data security protocols to ensure Plaintiffs' and Class Members' PII and PHI in its possession was adequately secured and protected; (2) implementing processes that would detect an unauthorized breach of its security systems and data storage architecture in a timely and adequate manner; (3) timely acting on all warnings and alerts, including public information, regarding its security vulnerabilities and potential compromise of the PII and PHI of Plaintiffs and Class Members; and (4) maintaining data security measures consistent with industry standards and applicable federal and state laws and other requirements.

123.    Defendant had a common law duty to prevent foreseeable harm to Plaintiffs and Class Members. The duty existed because Plaintiffs and Class Members were the foreseeable and probable victims of any inadequate security practices of Defendant in its collection, storage, and use of PII and PHI from Plaintiffs and Class Members. In fact, not only was it foreseeable that Plaintiffs and Class Members would be harmed by the failure to protect their PII and PHI because malicious actors routinely attempt to steal such information for use in nefarious purposes, but Defendant also knew that it was more likely than not Plaintiffs and Class Members would be harmed as a result.

124.    Defendant's duties to use adequate and reasonable security measures also arose as a result of the special relationship that existed between it, on the one hand, and Plaintiffs and Class

Members, on the other hand. This special relationship arose because Defendant collected, stored, and used the PII and PHI of Plaintiffs and Class Members for the procurement and provision of health services for Plaintiffs and Class Members. Defendant alone could have ensured that its security systems and data storage architecture were sufficient to prevent or minimize the Data Breach.

125.    Additionally, the policy of preventing future harm weighs in favor of finding a special relationship between Defendant and Plaintiffs and Class Members. If companies are not held accountable for failing to take adequate and reasonable security measures to protect the sensitive PII and PHI in their possession, they will not take the steps that are necessary to protect against future security breaches.

126.    The injuries suffered by Plaintiffs and Class Members were proximately and directly caused by Defendant's failure to follow reasonable, industry standard security measures to protect Plaintiffs' and Class Members' PII and PHI.

127.    When individuals have their personal information stolen, they are at substantial risk for imminent identity theft, and need to take steps to protect themselves, including, for example, buying credit monitoring services and purchasing or obtaining credit reports to protect themselves from identity theft.

128.    If Defendant had implemented the requisite, industry standard security measures and exercised adequate and reasonable care, data thieves would not have been able to take the PII and PHI of Plaintiffs and Class Members.

129.    Defendant breached these duties through the conduct alleged here in this Second Amended Consolidated Complaint by, including without limitation, failing to protect the PII and PHI in its possession; failing to maintain adequate computer systems and allowing unauthorized

access to and exfiltration of Plaintiffs' and Class Members' PII and PHI; and failing to disclose the material fact that Defendant's computer systems and data security practices were inadequate to safeguard the PII and PHI in its possession from theft.

130.    But for Defendant's wrongful and negligent breach of its duties owed to Plaintiffs and Class Members, their PII and PHI would not have been compromised. And as a direct and proximate result of Defendant's failure to exercise adequate and reasonable care and use commercially adequate and reasonable security measures, the PII and PHI of Plaintiffs and Class Members were accessed by ill-intentioned individuals who could and will use the information to commit identity or financial fraud. Plaintiffs and Class Members face the imminent, certainly impending, and substantially heightened risk of identity theft, fraud, and further misuse of their personal data.

131.    There is a temporal and close causal connection between Defendant's failure to implement security measures to protect the PII and PHI of current and former patients and the harm suffered, or risk of imminent harm suffered, by Plaintiffs and Class Members.

132.    It was foreseeable that Defendant's failure to exercise reasonable care to safeguard the PII and PHI in its possession or control would lead to one or more types of injury to Plaintiffs and Class Members. And the Data Breach was foreseeable given the known, high frequency of cyberattacks and data breaches in the healthcare industry.

133.    Plaintiffs and Class Members were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew of or should have known of the inherent risks in collecting and storing PII and PHI, the critical importance of providing adequate security of PII and PHI, the current cyber scams being perpetrated on PII and PHI, and that it had

inadequate protocols, including security protocols in place to secure the PII and PHI of Plaintiffs and Class Members.

134.    Defendant's own conduct created the foreseeable risk of harm to Plaintiffs and Class Members. Defendant's misconduct included its failure to take the steps and opportunities to prevent the Data Breach and its failure to comply with industry standards for the safekeeping and encrypted authorized disclosure of the PII and PHI of Plaintiffs and Class Members.

135.    Plaintiffs and Class Members have no ability to protect their PII and PHI that was and is in Defendant's possession. Defendant alone was and is in a position to protect against the harm suffered by Plaintiffs and Class Members as a result of the Data Breach.

136.    As a direct and proximate result of Defendant's negligence as alleged above, Plaintiffs and Class Members have suffered, will suffer, or are at increased risk of suffering:

   a.   The compromise, publication, theft and/or unauthorized use of their PII and PHI;

   b.    Unauthorized use and misuse of their PII and PHI;

   c.   The loss of the opportunity to control how their PII and PHI are used;

   d.   Out-of-pocket costs associated with the prevention, detection, recovery and remediation from identity theft or fraud;

   e.   Lost opportunity costs and lost wages and time associated with efforts expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest and recover from identity theft and fraud;

   f.   The imminent and certain impending injury flowing from potential fraud and identity theft posed by their PII and PHI being placed in the hands of criminals;

g.   The continued risk to their PII and PHI that is subject to further breaches so long as Defendant fails to undertake appropriate measures to protect the PII and PHI in Defendant's possession; and

h.   Current and future costs in terms of time, effort and money that will be expended to prevent, detect, contest, remediate and repair the impact of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

137.   Pursuant to the FTC Act, 15 U.S.C. § 45, Defendant had a duty to provide fair and adequate computer systems and data security measures to safeguard the PII and PHI of Plaintiffs and Class Members.

138.   The FTC Act prohibits "unfair . . . practices in or affecting commerce," which the FTC has interpreted to include businesses' failure to use reasonable measures to protect PII and PHI. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard. In addition, individual states have enacted statutes based upon the FTC Act that also created a duty.

139.   Defendant solicited, gathered, and stored PII and PHI of Plaintiffs and Class Members to facilitate transactions which affect commerce.

140.   Defendant violated the FTC Act (and similar state statutes) and HIPAA, by failing to use reasonable measures to protect PII and PHI of Plaintiffs and Class Members and not complying with applicable industry standards, as described herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII and PHI obtained and stored and the foreseeable consequences of a data breach on Defendant's systems.

141.   Defendant's violations of the FTC Act (and similar state statutes) and HIPAA are evidence of negligence.

142.     Plaintiffs and Class Members are within the class of persons that the FTC Act (and similar state statutes) and HIPAA were intended to protect.

143.     The harm that occurred as a result of the Data Breach is the type of harm the FTC Act (and similar state statutes) and HIPAA were intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ adequate and reasonable data security measures caused the same harm as that suffered by Plaintiffs and Class Members.

144.     As a direct and proximate result of Defendant's violations of the above-mentioned statutes (and similar state statutes), Plaintiffs and Class Members have suffered, and continue to suffer, damages arising from the Data Breach as described herein and are entitled to compensatory, consequential, and punitive damages in an amount to be proven at trial.

## COUNT II
### Negligence Per Se

145.     Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

146.     Defendant's unreasonable data security measures constitute unfair or deceptive acts or practices in or affecting commerce in violation Section 5 of the FTC Act. Although the FTC Act does not create a private right of action, it requires businesses to institute reasonable data security measures and breach notification procedures, which Defendant failed to do.

147.     Section 5 of the FTCA, 15 U.S.C. § 45, prohibits "unfair. . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by businesses like Defendant of failing to use reasonable measures to protect users' sensitive data. The FTC's complaint against Defendant also forms the basis of Defendant's duty.

148.    Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect users' personally identifying information and sensitive data and by not complying with applicable industry standards. Defendant's conduct was particularly unreasonable given the sensitive nature and amount of data Defendant stored on its users and the foreseeable consequences of a Data Breach should Defendant fail to secure its systems.

149.    Defendant's violation of Section 5 of the FTC Act constitutes negligence per se.

150.    In addition, under state data security statutes, Defendant had a duty to implement and maintain reasonable security procedures and practices to safeguard Plaintiffs' and Class Members' PII.

151.    Defendant's violation of Section 5 of the FTC Act (and similar state statutes) constitutes negligence per se.

152.    Plaintiffs and Class Members are within the class of persons Section 5 of the FTC Act was intended to protect.

153.    The harm that has occurred is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses that, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and the Class.

154.    Defendant breached its duties to Plaintiffs and Class Members under the FTC Act and state data security statutes by failing to provide fair, reasonable, or appropriate computer systems and data security practices that complied with applicable industry standards to safeguard Plaintiffs' and Class Members' PII.

155.    Plaintiffs and Class Members were foreseeable victims of Defendant's violations of the FTC Act and state data security statutes. Defendant knew or should have known that its

failure to implement reasonable measures to protect and secure Plaintiffs' and Class Members' PII that complied with applicable industry standards would cause damage to Plaintiffs and Class Members.

156.     But for Defendant's violation of the applicable laws and regulations, Plaintiffs' and Class Members' PII would not have been accessed by unauthorized parties.

157.     As a direct and proximate result of Defendant's negligence per se, Plaintiffs and Class Members have been injured and are entitled to damages in an amount to be proven at trial. Such injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen PII; illegal sale of the compromised PII on illicit markets; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach reviewing bank statements, credit card statements, and credit reports, among other related activities; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of the PII; the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of Defendant's Data Breach; lost benefit of their bargains and overcharges for services or products; nominal and general damages; and other economic and non-economic harm.

## COUNT III
### Breach of Contract

158.     Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

159.    Plaintiffs and Class Members entered into a valid and enforceable contract through which they were required to turn over their sensitive personal information to AmeriBen in exchange for services.

160.    That contract included promises by AmeriBen to secure, safeguard, and not disclose Plaintiffs' and Class Members' sensitive personal information to any third parties without their consent.

161.    AmeriBen's Privacy Policy memorialized the rights and obligations of AmeriBen and its customers. This document was provided to Plaintiffs and Class Members in a manner in which it became part of the agreement for services.

162.    In its Privacy Policy, AmeriBen commits to protecting the privacy and security of its members' sensitive personal information and promises to never share Plaintiffs' and Class Members' PII except under certain limited circumstances.

163.    Plaintiffs and Class Members fully performed their obligations under their contracts with AmeriBen. However, AmeriBen failed to secure, safeguard, and/or keep private Plaintiffs' and Class Members' PII, and therefore AmeriBen breached its contracts with Plaintiffs and Class Members.

164.    Defendant's failure to satisfy its confidentiality and privacy obligations, specifically those arising under the FTC Act, resulted in Defendant providing services to Plaintiffs and Class Members that were of a diminished value and in breach of its contractual obligations to Plaintiffs and Class Members.

165.    As a result, Plaintiffs and Class Members have been harmed, damaged, and/or injured as described herein, including by Defendant's failure to fully perform its part of the agreement with Plaintiffs and Class Members.

166.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members suffered and will continue to suffer damages in an amount to be proven at trial.

167.    In addition to monetary relief, Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to, inter alia, strengthen its data security monitoring and supervision procedures, conduct periodic audits of those procedures, and provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

## COUNT IV
### Breach of Implied Contract

168.    Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

169.    This Count is pleaded in the alternative to Count III above.

170.     Defendant provides third party administrative services to Plaintiffs and Class Members. Plaintiffs and Class Members formed an implied contract with Defendant regarding the provision of those services through its collective conduct, including by Plaintiffs and Class Members providing their PII and PHI to Defendant in exchange for the services offered.

171.    Through Defendant's offering of these services, it knew or should have known that it needed to protect Plaintiffs' and Class Members' confidential PII and PHI in accordance with its own policies, practices, and applicable state and federal law.

172.    As consideration, Plaintiffs and Class Members turned over valuable PII bargained with Defendant to securely maintain and store their PII.

173.    Defendant accepted possession of Plaintiffs' and Class Members' PII and PHI for the purpose of providing services, including data security, to Plaintiffs and Class Members.

174.    In delivering their PII and PHI to Defendant in exchange for its services, Plaintiffs and Class Members intended and understood that Defendant would adequately safeguard their PII and PHI as part of those services.

175.    Defendant's implied promises to Plaintiffs and Class Members include, but are not limited to, (1) taking steps to ensure that anyone who is granted access to PII, including its business associates, vendors, and/or suppliers, also protect the confidentiality of that data; (2) taking steps to ensure that the PII that is placed in the control of its business associates, vendors, and/or suppliers is restricted and limited to achieve an authorized business purpose; (3) restricting access to qualified and trained employees, business associates, vendors, and/or suppliers; (4) designing and implementing appropriate retention policies to protect the PII against criminal data breaches; (5) applying or requiring proper encryption; (6) implementing multifactor authentication for access; and (7) taking other steps to protect against foreseeable data breaches.

176.    Plaintiffs and Class Members would not have entrusted their PII and PHI to Defendant in the absence of such an implied contract.

177.    Had Defendant disclosed to Plaintiffs and the Class that it did not have adequate data security and data supervisory practices to ensure the security of their sensitive data, Plaintiffs and Class Members would not have agreed to provide their PII and PHI to Defendant.

178.    As providers of third party administration servicing operations, Defendant recognized (or should have recognized) that Plaintiffs' and Class Member's PII and PHI is highly sensitive and must be protected, and that this protection was of material importance as part of the bargain with Plaintiffs and the Class.

179.     Defendant violated these implied contracts by failing to employ reasonable and adequate security measures and supervision of its vendors, business associates, and/or suppliers to secure Plaintiffs' and Class Members' PII and PHI.

180.     A meeting of the minds occurred, as Plaintiffs and Class Members agreed, *inter alia*, to provide their accurate and complete sensitive personal information to Defendant in exchange for Defendant's agreement to, *inter alia*, protect their PII.

181.     Plaintiffs and Class Members have been damaged by Defendant's conduct, including the harms and injuries arising from the Data Breach now and in the future, as alleged herein.

## COUNT V
### Breach of Fiduciary Duty

182.     Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

183.     A relationship existed between Plaintiffs and Class Members and Defendant in which Plaintiffs and Class Members put their trust in Defendant to protect the PII of Plaintiffs and Class Members and Defendant accepted that trust.

184.     Defendant breached the fiduciary duties that it owed to Plaintiffs and Class Members by failing to act with the utmost good faith, fairness, and honesty, failing to act with the highest and finest loyalty, and failing to protect the PII of Plaintiffs and Class Members.

185.     Defendant's breach of fiduciary duty was a legal cause of damage to Plaintiffs and Class Members.

186.     But for Defendant's breach of fiduciary duty, the damage to Plaintiffs and Class Members would not have occurred.

187.    Defendant's breach of fiduciary duty contributed substantially to producing the damage to Plaintiffs and Class Members.

188.    As a direct and proximate result of Defendant's breach of fiduciary duty, Plaintiffs are entitled to and demand actual, consequential, and nominal damages and injunctive relief.

## COUNT VI
### Unjust Enrichment/Quasi Contract

189.    Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

190.    Plaintiffs and Class Members conferred a benefit on Defendant. Specifically, they provided Defendant with their PII and PHI, which PII and PHI has inherent value. In exchange, Plaintiffs and Class Members should have been entitled to Defendant's adequate protection and supervision of their PII and PHI, especially in light of their special relationship.

191.     Defendant knew that Plaintiffs and Class Members conferred a benefit upon them and have accepted and retained that benefit by accepting and retaining the PII entrusted to them. Defendant profited from Plaintiffs' retained data and used Plaintiffs' and Class Members' PII for business purposes.

192.    Defendant failed to secure Plaintiffs' and Class Members' PII and, therefore, did not fully compensate Plaintiffs or Class Members for the value that their PII provided.

193.    Defendant acquired the PII through inequitable record retention as it failed to disclose the inadequate data security practices, procedures, and protocols previously alleged.

194.    If Plaintiffs and Class Members had known that Defendant would not use adequate data security practices, procedures, and protocols to secure their PII and PHI, they would have made alternative servicing choices that excluded Defendant.

195.    Under the circumstances, it would be unjust for Defendant to be permitted to retain any of the benefits that Plaintiffs and Class Members conferred upon them.

196.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and/or will suffer injury, including but not limited to: (i) the imminent and substantial risk of actual identity theft; (ii) the loss of the opportunity to control how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their PII, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect PII in their continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

197.    Plaintiffs and Class Members are entitled to full refunds, restitution, and/or damages from Defendant and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct alleged herein. This can be accomplished by establishing a constructive trust from which the Plaintiffs and Class Members may seek restitution or compensation.

198.    Plaintiffs and Class Members may not have an adequate remedy at law against Defendant, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

<u>**COUNT VII**</u>
**Declaratory and Injunctive Relief**

199.    Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

200.    Under the Declaratory Judgment Act, 28 U.S.C. §§2201, et seq., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as those alleged herein, which are tortious, and which violate the terms of the federal and state statutes described above.

201.    An actual controversy has arisen in the wake of the Data Breach at issue regarding Defendant's common law and other duties to act reasonably with respect to safeguarding the data of Plaintiffs and the Class. Plaintiffs allege Defendant's actions in this respect were inadequate and unreasonable and, upon information and belief, remain inadequate and unreasonable. Additionally, Plaintiffs and the Class continue to suffer injury due to the continued and ongoing threat of additional fraud against them or on their accounts.

202.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a.   Defendant owed, and continues to owe a legal duty to secure the sensitive personal information with which it is entrusted, specifically including information obtained from its customers, and to notify impacted individuals of the Data Breach under the common law, Section 5 of the FTC Act;

b.  Defendant breached, and continues to breach, its legal duty by failing to employ reasonable measures to secure its customers' personal information; and,

c.  Defendant's breach of its legal duty continues to cause harm to Plaintiffs and the Class.

203.  The Court should also issue corresponding injunctive relief requiring Defendant to employ adequate security protocols consistent with industry standards to protect its users' data.

204.  If an injunction is not issued, Plaintiffs and the Class will suffer irreparable injury and lack an adequate legal remedy in the event of another breach of Defendant's data systems. If another breach of Defendant's data systems occurs, Plaintiffs and the Class will not have an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages, while warranted to compensate Plaintiffs and the Class for their out-of-pocket and other damages that are legally quantifiable and provable, do not cover the full extent of injuries suffered by Plaintiffs and the Class, which include monetary damages that are not legally quantifiable or provable.

205.  The hardship to Plaintiffs and the Class if an injunction does not issue exceeds the hardship to Defendant if an injunction is issued.

206.  Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach, thus eliminating the injuries that would result to Plaintiffs, the Class, and the public at large.

**COUNT VIII**
**Florida Deceptive and Unfair Trade Practices Act**
**Fla. Stat. §§ 501.201, *et seq*.**

207.    The Florida Plaintiffs identified above ("Plaintiff" for purposes of this Count), individually and on behalf of the Florida Subclass, repeats and realleges the factual allegations set forth in every preceding paragraph as if fully set forth herein.

208.    Each of the Plaintiffs and Florida Subclass Members are "consumers" as defined by Fla. Stat. § 501.203.

209.    Defendant advertised, offered, or sold goods or services in Florida and engaged in trade or commerce directly or indirectly affecting the people of Florida.

210.    Defendant engaged in unconscionable, unfair, and deceptive acts and practices in the conduct of trade and commerce, in violation of Fla. Stat. § 501.204(1), including:

   a.    Failing to implement and maintain reasonable security and privacy measures to protect Plaintiffs' and Class members' PII, which was a direct and proximate cause of the Data Breach;

   b.    Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures in response to industry standards and best practices, which directly caused the Data Breach;

   c.    Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Class members' PII, including duties imposed by the FTC Act and the Safeguards Rule, which directly caused the Data Breach;

   d.    Misrepresenting that Defendant would protect the privacy and confidentiality of Plaintiffs' and Class members' PII, including by implementing and maintaining

reasonable security measures, which directly caused the Data Breach;

e.  Misrepresenting that Defendant would comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Class members' PII, which directly caused the Data Breach;

f.  Omitting, suppressing, and concealing the material facts that it did not reasonably or adequately secure or monitor its systems to prevent and detect unauthorized access, which directly caused the Data Breach.

211.  Defendant's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendant's data security and ability to protect the confidentiality of consumers' PII.

212.  Had Defendant disclosed to Plaintiff and Subclass Members that its data systems were not secure and, thus, were vulnerable to attack, Defendant would have been unable to continue in business and it would have been forced to adopt reasonable data security measures and comply with the law. Defendant was trusted with sensitive and valuable PII and PHI regarding millions of consumers, including Plaintiff and Subclass Members. Defendant accepted the responsibility of protecting the data but kept the inadequate state of its security controls secret from the public. Accordingly, Plaintiff and Subclass Members acted reasonably in relying on Defendant's misrepresentations and omissions, the truth of which they could not have discovered.

213.  As a direct and proximate result of Defendant's unconscionable, unfair, and deceptive acts and practices, Plaintiff and Florida Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, as described herein, including but not limited to fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased,

imminent risk of fraud and identity theft; loss of value of their PII; overpayment for Defendant's services; loss of the value of access to their PII; and the value of identity protection services made necessary by the Data Breach.

214.   Plaintiff and Florida Subclass Members seek all monetary and non-monetary relief allowed by law, including actual damages under Fla. Stat. § 501.211; declaratory and injunctive relief; reasonable attorneys' fees and costs, under Fla. Stat. § 501.2105(1); and any other relief that is just and proper.

## PRAYER FOR RELIEF

**WHEREFORE** Plaintiffs, on behalf of themselves and the Class, request that this Court award relief as follows:

A.   An order certifying the class and designating Plaintiffs as the Class Representatives and their counsel as Class Counsel;

B.   An award to Plaintiffs and the proposed Class members of damages and equitable relief with pre-judgment and post-judgment interest;

C.   A declaratory judgment in favor of Plaintiffs and the Class finding that the Defendant owed, and continue to owe a legal duty to secure the sensitive personal information with which it is entrusted, specifically including information obtained from its customers, and to notify impacted individuals of the Data Breach under the common law, Section 5 of the FTC Act; that the Defendant breached, and continues to breach, its legal duty by failing to employ reasonable measures to secure its customers' personal information; and that the Defendant's breach of its legal duty continues to cause harm to Plaintiffs and the Class.

D.   Injunctive relief to Plaintiff and the Class;

E.      An award of attorneys' fees and costs as allowed by law; and

F.      An award such other and further relief as the Court may deem necessary or appropriate.

G.      Costs and reasonable attorneys' fees as to Counts One through Five; and,

H.      Such other relief which this Court may deem appropriate.

## JURY DEMAND

Plaintiffs Miles Black and Melissa Black hereby respectfully demand a trial by jury on all such claims that may be so tried, with the maximum number of jurors permitted by law.

Dated: August 25, 2023                    Respectfully submitted,

By:        /s/Bonner C. Walsh
           Bonner C. Walsh
           bonner@walshpllc.com
           Idaho State Bar Number 9646
           **WALSH PLLC**
           1561 Long Haul Road
           Grangeville, ID 83530
           Phone 541.359.2827
           Facsimile 866.503 8206

           Marc E. Dann
           Brian D. Flick
           (*pro hac vice* to be submitted)
           notices@dannlaw.com
           **Dann Law**
           15000 Madison Ave.
           Lakewood, OH 44107
           Phone: (216) 373-0539
           Facsimile: (216) 373-0536

           Thomas A. Zimmerman, Jr.
           (*pro hac vice* to be submitted)
           Zimmerman Law Offices, P.C.
           77 W. Washington Street, Suite 1220
           Chicago, Illinois 60602
           (312) 440-0020 telephone
           (312) 440-4180 facsimile
           www.attorneyzim.com

firm@attorneyzim.com

*Attorneys for Plaintiffs Miles Black and Melissa Black*