Bonner C. Walsh
bonner@walshpllc.com
Idaho State Bar Number 9646
**WALSH PLLC**
1561 Long Haul Road
Grangeville, ID 83530
Phone 541.359.2827
Facsimile 866.503 8206

[Additional counsel on signature page]

*Attorneys for Plaintiffs Miles and Melissa Black and the Putative Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO
## SOUTHERN DIVISION AT BOISE

| | |
|---|---|
| **MILES BLACK and MELISSA BLACK,** individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br> v. <br><br> **IEC GROUP INC., d/b/a AMERIBEN** <br><br> Defendant. | Case No. 1:23-cv-00384-AKB <br><br> PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT (DEMAND FOR JURY TRIAL) |

Plaintiffs Miles Black, and Melissa Black, individually and on behalf of all others similarly situated ("Plaintiffs"), through counsel, for their *First Amended Complaint for Damages* against Defendant IEC Group Inc. d/b/a AmeriBen ("Defendant" or "AmeriBen"), state as follows:

### PARTIES, JURISDICTION, AND VENUE

1.     Plaintiff Miles Black is a natural person and a citizen of Florida and resident of Hernando County, Florida.

2.     Plaintiff Melissa Black is a natural person and a citizen of Florida and resident of Hernando County, Florida.

3.     Defendant is a domestic corporation headquartered in Meridian, Idaho. Its principal place of business is located in Ada County, Idaho at 2888 West Excursion Lane, Meridian, Idaho 83642.  Its registered agent is CT Corporation System, 1555 W. Shoreline Drive, Suite 100, Boise ID 83702.

4.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1322, as amended by the Class Action Fairness Act of 2005. Subject matter jurisdiction is proper because: 1) the amount in controversy in this class action exceeds five million dollars ($5,000,000), excluding interest and costs; 2) there are more than 100 Class members; 3) at least member of the Class is diverse from the Defendant; and 4) the Defendant is not a government entity.

5.     This Court is the proper venue for this case pursuant to 28 U.S.C. § 1391(a) and (b) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District and because Defendant resides and/or is registered to do business and transact business in this District.

## SUMMARY OF CLAIMS

6.     Plaintiffs bring this suit on behalf of themselves and a Class of similarly situated individuals to hold Defendant accountable for the harm it caused to Plaintiffs and Class members from its failure to properly secure and safeguard their sensitive personally identifiable information ("PII"), including their names, financial information, and protected health information ("PHI"), such as  member identification numbers, healthcare provider, and health insurance information (collectively, "Sensitive Information").

7.     The full extent of the types of Sensitive Information, the scope of the breach, and the root cause of the breach is all within the exclusive control of the Defendant, its agents, counsel,

and forensic consultants at this phase of litigation. Based on publicly available information it would appear that more than 74,000 individuals had their Sensitive Information exposed.[1]

8.      Defendant is a third party administrator of health insurance, which administers employer sponsored benefit plans for plan members. In providing its third-party administration services, AmeriBen collects Sensitive Information from its members, their healthcare providers, insurers, and others. With over one million members,[2] AmeriBen hosts an extensive repository of Sensitive Information of its customers.

9.      Defendant expressly and impliedly promised Plaintiffs and its other customers that it will maintain the privacy and confidentiality of Plaintiffs' and Class members' Sensitive Information.

10.     Based on members' reasonable expectation of privacy, Defendant's express and implied promises, statutes, rules, and industry standards protecting clients' Sensitive Information, clients expect that their Sensitive Information exchanged between them and their third-party administrator will remain confidential and that Defendant would employ reasonable data security practices so that it would not be shared or disclosed to, or stolen by unauthorized third parties.

11.     On or about August 14, 2023, Plaintiffs each received a letter from AmeriBen, an exemplar of which is attached as **Exhibit A.** In the letter, Plaintiffs were informed for the first time that an AmeriBen associate exposed Plaintiffs' Sensitive Information to unauthorized access and potential misuse ("Data Breach"). The Sensitive Information included, but was not limited to,

---

[1] https://www.hipaajournal.com/phi-of-almost-75000-individuals-exposed-in-email-incident-at-ameriben/ (last visited August 20, 2023).

[2] https://services.ameriben.com/company (last visited August 24, 2023)

name, employer's name, a unique tracking number, healthcare provider name, claim number, date of service, and the amount billed or paid.

12. Defendant did not adequately safeguard and protect Plaintiffs' Sensitive Information, and now Plaintiffs, along with Class Members, are the victims of a significant Data Breach that, among other harms, puts them at a substantially increased risk of identity fraud, which will negatively impact them for years.

13. Defendant is responsible for this Data Breach through its failure to implement and maintain adequate and reasonable data security safeguards, its failure to comply with industry-standard data security practices, and its failure to comply with federal and state laws and regulations governing data security and privacy of the Sensitive Information.

14. Defendant had numerous statutory, regulatory, and common law duties to Plaintiffs and Class Members to keep their Sensitive Information confidential, safe, secure, and protected from unauthorized disclosure or access, including duties under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). Defendant was and still is required to maintain the security and privacy of the Sensitive Information entrusted to them. When Plaintiffs and Class Members provided their Sensitive Information, Defendant and its agents were required to comply with these obligations to keep Plaintiffs' Sensitive Information secure and safe from unauthorized access, to use this information for business purposes only, and to make only authorized disclosures of this information.

15. In this era of frequent data security attacks and data breaches, particularly in the healthcare industry, Defendant's failures leading to the Data Breach are particularly egregious.

16. Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their Sensitive Information.

17. As a result of Defendant's failures, the Sensitive Information of Plaintiffs and Class Members were exposed to malicious and criminal actors. As a direct and proximate result, Plaintiffs and Class Members are now at a significant present and future risk of identity theft, financial fraud, and/or other identity-theft or fraud, imminently and for years to come.

18. Plaintiffs and Class Members have suffered numerous actual and imminent injuries as a direct result of the Data Breach, including: (a) theft of their valuable Sensitive Information; (b) costs associated with the detection and prevention of identity theft; (c) costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the consequences of the Data Breach; (d) the actual and/or imminent injury arising from actual and/or potential fraud and identity theft posed by their personal data being placed in the hands of ill-intentioned hackers and/or criminals; (e) damages to and diminution in value of their personal data; (f) invasion of privacy; (g) actual damages in the form of the difference in value between the services that should have been delivered and the services that were actually delivered; and (h) the continued risk to their Sensitive Information, which remains in the possession of Defendant, and which is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' Sensitive Information.

19. Plaintiffs seek to remedy these harms, and to prevent their future occurrence, on behalf of themselves and all similarly situated persons whose Sensitive Information was compromised as a result of the Data Breach.

## FACTUAL BACKGROUND

**A. Defendant Collected, Maintained, and Stored Sensitive Information.**

20. Employers contract with AmeriBen to provide an allegedly more efficient process by which employees may obtain health insurance and process claims. According to AmeriBen, it serves over 160 employer groups and administers benefits to millions of members.[3]

21. In providing its third-party administration services, AmeriBen collects Sensitive Information from its members, their healthcare providers, employers, and insurers. This information includes name, email address, username, password, social security number, phone number, mailing address, financial information and history, employment information, drivers' license information, insurance information, marital status, and other personal and highly sensitive personal information a person might provide when enrolling in an employer sponsored benefit plan.

22. By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and the Class Members' Sensitive Information, Defendant assumed legal and equitable duties to those individuals and knew or should have known that they were responsible for protecting Plaintiffs' and Class Members' Sensitive Information from disclosure.

23. Plaintiffs and the Class Members have taken reasonable steps to maintain the confidentiality of their Sensitive Information. Defendant was required to keep Plaintiffs' and Class Members' Sensitive Information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

**B. The Data Breach**

24. On July 12, 2023, AmeriBen learned that on December 6, 2022, an AmeriBen associate attached an Excel spreadsheet in an email to one or more members which contained portions of a claims report. While the spreadsheet was reportedly "filtered" when it was sent out,

---

[3] https://services.ameriben.com/company (last visited August 24, 2023)

AmeriBen discovered that it was possible to "unfilter" the spreadsheet which would reveal the information of other members contained in the claims report.

25.     Defendant began notifying the individual victims of the Data Breach in August 2023. Plaintiffs each received Data Breach notice letters from AmeriBen, dated August 14, 2023, notifying them of the Data Breach.

26.     The letters detailed the circumstances of the Data Breach mentioned above and further encouraged Plaintiffs and Class Members to contact them as soon as possible if "you notice anything in your health records or explanation of benefits (EBOs) that doesn't look right."

27.     The Data Breach notice does not address any compensation for the unauthorized release and disclosure of Plaintiffs' and Class Members' Sensitive Information, including private and sensitive medical information.

28.     While the letters advised Plaintiffs and Class Members to "monitor [their] credit reports," and further advised that Plaintiffs' and Class Members had had the right to obtain "one free credit report annually from each of the three major credit reporting bureaus," Defendant did not offer to pay costs associated with Plaintiffs obtaining more than "one free credit report annually[.]"

29.     This is wholly inadequate because victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft. Furthermore, Defendant's providing information on how to sign up for free credit monitoring squarely places the burden on Plaintiffs and Class Members, rather than Defendant, to investigate and protect themselves from Defendant's tortious acts resulting in the Data Breach. Rather than automatically enrolling Plaintiffs and Class Members in credit monitoring services upon discovery of the Data Breach,

Defendant merely sent instructions "offering" the services to affected patients recommending they sign up for the services.

30.     The Data Breach notices also advised Plaintiffs and Class Members of their right to obtain a security freeze on their respective credit reports. However, it acknowledged that "using a credit freeze to take control over who gets access to the personal and financial information in your credit report may delay, interfere with, or prohibit the timely approval of any subsequent request or application you make regarding a new loan, credit, mortgage, or any other account involving the extension of credit."

31.     Based on Defendant's urging Plaintiffs and Class Members to take these mitigating actions immediately, it is abundantly clear that the perils from the Data Breach are real and concrete, and not hypothetical or attenuated.

32.     Despite all of the publicly available knowledge of the continued compromises of Sensitive Information, Defendant's approach to maintaining the privacy of Plaintiffs' and Class Members' Sensitive Information was inadequate, unreasonable, reckless, and negligent. This is evidenced by Defendant's Data Breach notice, in which Defendant stated in response to the Data Breach that they "are taking steps to reduce the risk of this happening again." Implied in Defendant's statement is an admission that Defendant's technical and cybersecurity capabilities were inadequate, which resulted in the Data Breach and the divulgence of Plaintiffs' and Class Members' Sensitive Information.

**C.     Defendant Knew It Needed to Protect Customers' Sensitive Personal Information**

33.     Defendant is fully aware of how sensitive the Sensitive Information it stores and maintains is. It is also aware of how much Sensitive Information it collects, uses, and maintains from Plaintiffs and Class Members.

34. Businesses that store personal information are likely to be targeted by cyber criminals. Credit card and bank account numbers are tempting targets for hackers, but credit and debit cards can be canceled, quickly mitigating the hackers' ability to cause further harm. Instead, PHI and types of PII that cannot be easily changed (such as dates of birth and Social Security numbers) are the most valuable to hackers.[4]

35. Defendant knew or should have known that it was an ideal target for hackers and others with nefarious purposes related to sensitive personal identifying and health information. AmeriBen processed and saved multiple types, and many levels, of Sensitive Information through its computer data and storage systems.

36. Indeed, the Federal Bureau of Investigation ("FBI") has expressed concerns about data security in the healthcare industry. In August 2014, after a cyberattack on Community Health Systems, Inc., the FBI warned companies within the healthcare industry, like Defendant, that hackers were targeting them. The warning stated that "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining the Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PHI)."[5]

37. The healthcare sector reported the second largest number of breaches among all measured sectors in 2018, with the highest rate of exposure per breach.[6]

---

[4] Calculating the Value of a Data Breach – What Are the Most Valuable Files to a Hacker? Donnellon McCarthy Enters. (July 21, 2020), https://www.dme.us.com/2020/07/21/calculatingthe-value-of-a-data-breach-what-are-the-most-valuable-files-to-a-hacker/. (last visited August 24, 2023)

[5] Jim Finkle, FBI warns healthcare firms that they are targeted by hackers, REUTERS (Aug. 2014), https://www.reuters.com/article/us-cybersecurity-healthcare-fbi/fbi-warnshealthcare-firms-they-are-targeted-by-hackers-idUSKBN0GK24U20140820, (last visited August 24, 2023)

[6] Identity Theft Resource Center, 2018 End-of-Year Data Breach Report,

38.     Healthcare related breaches have continued to rapidly increase because electronic patient data is seen as a valuable asset. According to the 2019 HIMSS Cybersecurity Survey, 82% of participating hospital information security leaders reported having a significant security incident in the last 12 months, with a majority of these known incidents being caused by "bad actors" such as cybercriminals.[7] "Hospitals have emerged as a primary target because they sit on a gold mine of sensitive personally identifiable information for thousands of patients at any given time. From social security and insurance policies, to next of kin and credit cards, no other organization, including credit bureaus, have so much monetizable information stored in their data centers."[8] This trend has continued more recently.  Data breaches have become alarmingly commonplace in the U.S. In 2021, data breaches increased by nearly 70% over the previous year, which is over 20% higher than the previous all-time high.[9]

39.     Furthermore, the healthcare sector was the easiest "mark" among all major sectors in 2021, meaning it had the highest number of data compromises and categorically had some of the most widespread exposure per data breach.[10] According to the 2021 Healthcare Information and Management Systems Society Cybersecurity Survey, 67% of participating hospitals reported

---

https://www.idtheftcenter.org/wp-content/uploads/2019/02/ITRC_2018-End-of-Year-Aftermath _FINAL_V2_combinedWEB.pdf, (last visited Aug. 24, 2023)

[7] 2019 HIMSS Cybersecurity Survey, https://www.himss.org/sites/hde/files/d7/u132196/2019_ HIMSS_Cybersecurity_Survey_Final_Report.pdf (last visited Aug. 24, 2023).

[8]  Eyal Benishti, How to Safeguard Hospital Data from Email Spoofing Attacks, Chief Healthcare Executive      (Apr.      4,      2019),      https://www.chiefhealthcareexecutive.com/view/how-to-safeguardhospital-data-from-email-spoofing-attacks, (last visited Aug. 24, 2023).

[9]      *2021      Annual      Data      Breach      Year-End      Review*,      ITRC,      (Jan.      2022), https://www.idtheftcenter.org/publication/2021-annual-data-breach-report-2//

[10] *Id.*

having a significant security incident within the last twelve months, with a majority of those being caused by "bad actors."[11]

40.     Healthcare providers and vendors that maintain healthcare provider data "have emerged as a primary target because they sit on a gold mine of sensitive personally identifiable information for thousands of patients at any given time. From social security and insurance policies to next of kin and credit cards, no other organization, including credit bureaus, have so much monetizable information stored in their data centers.[12]

41.     As major healthcare service administrator, Defendant knew, or should have known, the importance of safeguarding the patients' PII and PHI entrusted to it and of the foreseeable consequences if that data was disclosed. Defendant failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

42.     By requiring the production of, collecting, obtaining, using, and deriving benefits from Plaintiffs' and Class Members' Sensitive Information, Defendant assumed certain legal and equitable duties, and they knew or should have known that it was responsible for the diligent protection of the Sensitive Information that it collected and stored.

43.     Defendant's notification letters acknowledge the importance of data security and its duty to Class Members, stating: "We're committed to protecting the privacy and security of your protected health information ("PHI")."

---

[11] *2021 HIMSS Cybersecurity Survey*, Healthcare Information and Management Systems Society, Inc., accessible at: https://www.himss.org/resources/himss-healthcare-cybersecurity-survey (last accessed Mar. 16, 2022).

[12] Benishti, Eyal, *How to Safeguard Hospital Data from Email Spoofing Attacks*, INSIDE DIGITAL HEALTH (Apr. 4, 2019), https://www.idigitalhealth.com/news/how-to-safeguard-hospitaldata-from-email-spoofing-attacks.

44.     Defendant has the resources and responsibility to invest in the necessary data security and protection measures. Yet, Defendant failed to undertake adequate analyses and testing of its own systems and other data security measures to avoid the failures that resulted in the Data Breach.

45.     The seriousness with which Defendant should have taken its data security is shown by the number of data breaches perpetrated in the healthcare, banking, and retail industries over the past few years.

46.     Protenus, a healthcare compliance analytics firm, analyzed data breach incidents disclosed to the U.S. Department of Health and Human Services or the media during 2019, finding that there has been an alarming increase in the number of data breaches of patient privacy since 2016, when there were 450 security incidents involving patient data.[13] In 2019 that number jumped to 572 incidents, which is likely an underestimate. There continues to be on average at least one health data breach every day.[14]

**D.     Value of the Stolen Data**

47.     The Federal Trade Commission ("FTC") has recognized that consumer data is a lucrative (and valuable) form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour underscored this point by reiterating that "most consumers

---

[13] Heather Landi, Number of patient records breached nearly triples in 2019, FIERCE HEALTHCARE (Feb. 20, 2020), https://www.fiercehealthcare.com/tech/number-patient-recordsbreached-2019-almost-tripled-from-2018-as-healthcare-faces-new-threats, (last visited Aug. 24, 2023)

[14] *Id.*

cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency."[15]

48.     Stolen PII and PHI are valuable commodities to identity thieves.  The purpose of stealing large blocks of Sensitive Information, like in this Data Breach, is to use the data for illicit purposes or to sell the data for profit to other criminals who buy the data and misuse it. PII data for sale is so valuable because PII is so broad, and it can therefore be used for a wide variety of criminal activity such as creating fake IDs, buying medical equipment and drugs that can be resold on the street, or combining patient numbers with false provider numbers to file fake claims with insurers, opening new financial accounts, obtaining government benefits, filing fraudulent tax returns, giving false information to police during an arrest, taking out loans, and to obtain medical services.[16]

49.     According to a Trustware report, a healthcare data record may be valued up to $250 per record on the black market compared to $5.40 for the next highest value (a payment card).[17]

50.     Healthcare related data is among the most sensitive and personally consequential when compromised.  "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery" reported Pam Dixon, executive director of World

---

[15] Statement of FTC Commissioner Pamela Jones Harbour—Remarks Before FTC Exploring Privacy Roundtable, (Dec. 7, 2009) (last visited Jan. 18, 2022) http://www/ftc/gov/speeches/harbour/091207privacyroundtable.pdf.

[16] *What to Know About Identity Theft,* FED TRADE COMM'N (April 2021), https://consumer.ftc.gov/articles/what-know-about-identity-theft/

[17] https://www.securelink.com/blog/healthcare-data-new-prize-hackers citing https://trustwave.azureedge.net/media/16096/2019-trustwave-global-security-report.pdf?rnd=132056250120000000. (last visited Aug. 24, 2023).

Privacy Forum.[18] A report focusing on health care breaches found that the "average total cost to resolve an identity theft related incident came to about $20,000."[19]

51.    Medical information is some of the highest value data.[20] In fact, according to the FBI's Cyber Division, healthcare records can be sold by criminals for 50 times the price of stolen Social Security numbers or credit card numbers. By one estimate, PHI can sell for as much as $363 according to the Infosec Institute.[21] And files containing PHI can be bought on the black market for between $1,200 and $1,300 each.[22] This data, as one would expect, demands a much higher price on the dark web. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[23] Likewise, the FBI has warned healthcare

---

[18] Michael Ollove, "The Rise of Medical Identity Theft in Healthcare," Kaiser Health News (Feb. 7 2014), https://khn.org/news/rise-of-indentity-theft/ (last visited Aug. 24, 2023).

[19] Elinor Mills, Study: Medical Identity theft is costly for victims, CNET (Mar.3, 2010) https://www.cnet.com/tech/services-and-software/study-medical-identity-theft-is-costly-for-victims/ (last visited Aug. 24, 2023).

[20] Calculating the Value of a Data Breach -What are the Most Valuable Files to a Hacker" Donnellon McCarthy Enters (July 21, 2020) https://www.dme.us.com/2020/07/21/calculating-the-value-of-a-data-breach-what-are-the-most-valuable-files-to-a-hacker/ (last visited Aug. 24, 2023).

[21] Data Breaches: In the Health Care Sector, Center for Internet Security, https://www.cisecurity.org/blog/data-breaches-in-the-healthcare-sector/ (last visited Aug. 24, 2023).

[22] Elizabeth Clarke, Hackers Sell Health Insurance Credentials, Bank Accounts, SSNs, and Counterfeit Documents Secure Works (July 15, 2013), https://www.secureworks.com/blog/general-hackers-sell-health-insurance-credentials-bank-accounts-ssns-and-counterfeit-documents (last visited Aug. 24, 2023).

[23] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT WORLD (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-hackpersonaldata-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

organizations that PII data is worth 10 times as much as personal credit card data on the black market.[24]

52.     Thus, the compromised Sensitive Information of Plaintiffs and Class Members have a high value in both legitimate and black markets. And Plaintiffs and Class Members have now lost the economic value of their Sensitive Information.

**E.     The Data Breach Justifies Reasonable Mitigation Efforts**

53.     It is well recognized that in data breaches fraudulent activity may not show up for prolonged periods of time -potentially years after PHI and PII are divulged to third party criminals. By some accounts, forty percent of consumers discovered they were victims of medical identity theft only after they received collection letters from creditors for expenses incurred in their names.[25]

54.     Here, not only was sensitive medical information divulged but also health insurance information, dates of birth, addresses, and names.  While it is unknown whether social security numbers were involved, social security numbers are not necessary for medical or financial identity theft with the Sensitive Information that is known to have been disclosed in this case.

---

[24] Stolen PHI health credentials can sell for up to 20 times the value of a U.S. credit card number, according to Don Jackson, director of threat intelligence at PhishLabs, a cyber-crime protection company who obtained his data by monitoring underground exchanges where cyber-criminals sell the information. *See* Humer, Caroline & Finkle, Jim, *Your medical record is worth more to hackers than your credit card*, REUTERS, (Sep. 24, 2014), https://www.reuters.com/article/uscybersecurity-hospitals/your-medical-record-is-worth-more-to-hackers-than-your-credit-cardidUSKCN0HJ21I20140924. Dark web monitoring is a commercially available service which, at a minimum, AHS can and should perform (or hire a third-party expert to perform).

[25] The Potential Damages and Consequences of Medical Identity Theft and Healthcare Data Breaches, Experian (Apr. 2010) https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf (last visited Aug. 24, 2023).

55. Despite Defendant's failure to protect Plaintiffs' and Class members' PII and PHI, AmeriBen has not offered Plaintiffs or Class members any recourse. The Notice Letter only addresses potential financial fraud but is practically useless for addressing the risk of medical identity fraud, which is also at heightened risk due to the type of information at issue in this Breach.

56. Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their Sensitive Information. Plaintiffs and Class Members, as current and former customers, and current and former employees, relied on Defendant to keep their Sensitive Information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosure of this information.

57. In an effort to mitigate the risk and potential losses, Plaintiffs have spent time reviewing bank accounts and insurance information looking for suspicious activity, researching the Breach, and otherwise spending time on this Data Breach. Plaintiffs will continue to spend time each week monitoring accounts in the future and remain at risk for future identity theft (financial and medical). These efforts are reasonable in light of the current and future risk of identity theft.

58. These efforts are also in line with FTC recommendations. The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (or an extended fraud alert that lasts for seven years if they learn someone has abused their information), reviewing their credit reports, contacting companies to dispute fraudulent charges on accounts, placing a credit freeze on their credit, and correcting their credit reports.[26]

---

[26] *See* https://www.identitytheft.gov/Steps (last visited Aug. 24, 2023).

**F.    Defendant's Conduct Violates HIPAA and Industry Standard Data Security Practices**

59.    Title II of HIPAA contains what are known as the Administrative Simplification provisions.[27] 42 U.S.C. §§ 1301, et seq. HIPAA provides specific privacy rules that require comprehensive administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of PII is properly maintained.[28]

60.    The Data Breach resulted from a combination of insufficiencies that indicate Defendant's failed to comply with safeguards mandated by HIPAA regulations and industry standards. The security failures include, but are not limited to:

   a.   Failing to maintain an adequate data security system to prevent data loss;

   b.   Failing to mitigate the risks of a data breach and loss of data;

   c.   Failing to adequately catalog the location of Plaintiffs' and Class Members' digital information;

   d.   Failing to properly encrypt Plaintiffs' and Class Members' PHI;

   e.   Failing to ensure the confidentiality and integrity of electronic PHI Defendant create, receive, maintain, and transmit in violation of 45 C.F.R. § 164.306(a)(1);

   f.   Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or

---

[27] HIPAA lists eighteen types of information that qualify as PHI according to guidance from the Department of Health and Human Services Office for Civil Rights, and includes, inter alia: names, addresses, any dates including dates of birth, social security numbers, and medical record numbers.

[28] *See* 45 C.F.R. § 164.306 (Security standards and General rules); 45 C.F.R. § 164.308 (Administrative safeguards); 45 C.F.R. § 164.310 (Physical safeguards); 45 C.F.R. § 164.312 (Technical safeguards).

software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

g. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

h. Failing to identify and respond to suspected or known security incidents; mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. § 164.308(a)(6)(ii);

i. Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

j. Failing to protect against any reasonably-anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

k. Failing to ensure compliance with HIPAA security standard rules by its workforce in violation of 45 C.F.R. § 164.306(a)(4);

l. Failing to implement technical policies and procedures for electronic information systems that maintain electronic PII to allow access only to those persons or software programs that have been granted access rights, in violation of 45 C.F.R. §164.312(a)(1);

m. Impermissibly and improperly using and disclosing PHI that is and remains accessible to unauthorized persons in violation of 45 C.F.R. § 164.502, et seq.;

n. Failing to effectively train all members of its workforce (including independent contractors) on the policies and procedures with respect to PHI as necessary and appropriate for the members of its workforce to carry out their functions and to

maintain security of PHI in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5); and

o.  Failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard PHI, in compliance with 45 C.F.R. § 164.530(c).

## G.     FTC Guidelines & Violations

61.     The Defendant also failed to comply with Federal Trade Commission ("FTC") guidelines.

62.     The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices.  In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cybersecurity guidelines for businesses.  The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed for authorized purposes; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[29]

63.     The FTC further recommends that companies not maintain PII and PHI longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords; use industry tested methods for security; monitor for suspicious activity on the

---

[29] Federal Trade Commission, Protecting Personal Information: A Guide for Business, available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Aug. 24, 2023).

network; and verify that third party providers, such as Bricker, have implemented reasonable security measures.[30]

## H. Defendant Acknowledges the Harm this Data Breach Has and Will Cause the Victims

64. Given the wide dissemination and value of the Sensitive Information for illicit purposes, it is highly probable that anybody who acquired Plaintiffs' and Class Members' Sensitive Information did so for the purpose of using that data to commit fraud, theft, and other crimes, or for the purpose of selling or providing the PII and PHI to other individuals intending to commit fraud, theft, and other crimes.

65. Given that this is the reason such Sensitive Information are sought by criminals, it is similarly probable that Plaintiffs and Class Members have already suffered injury and face a substantial risk for imminent and certainly impending future injury.

66. Defendant acknowledged the risk of fraud, theft, and other crimes faced by victims of the Data Breach in its notices to Plaintiffs and Class Members.

67. According to the Federal Trade Commission ("FTC"), identity theft wreaks havoc on consumers' finances, credit history, and reputation and can take time, money, and patience to resolve.[31] Identity thieves use stolen personal information for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank and finance fraud.[32]

---

[30] Federal Trade Commission, Start With Security, available at:
https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited Aug. 24, 2023).

[31] See Taking Charge, What to Do If Your Identity is Stolen, FTC, 3 (Apr. 2013),
https://www.justice.gov/usao-wdmi/file/764151/download, (last visited Aug. 24, 2023).

[32] See *id.* The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 16 C.F.R. §603.2(a). The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame,

68. The physical, emotional, and social toll suffered (in addition to the financial toll) by identity theft victims cannot be understated.[33] "A 2016 Identity Theft Resource Center survey of identity theft victims sheds light on the prevalence of this emotional suffering caused by identity theft: 74 percent of respondents reported feeling stressed[,] 69 percent reported feelings of fear related to personal financial safety[,] 60 percent reported anxiety[,] 42 percent reported fearing for the financial security of family members[, and] 8 percent reported feeling suicidal."[34]

69. More recently, the FTC released an updated publication on protecting PII for businesses, which includes instructions on protecting PII, properly disposing of PII, understanding network vulnerabilities, implementing policies to correct security problems, using intrusion detection programs, monitoring data traffic, and having in place a response plan.

70. The FTC has, upon information and belief, brought enforcement actions against businesses for failing to protect consumers' PII and PHI. The FTC has done this by treating a failure to employ reasonable measures to protect against unauthorized access to PII and PHI as a violation of the FTC Act, 15 U.S.C. § 45.

71. Identity thieves may commit various types of crimes such as, inter alia, immigration fraud, obtaining a driver's license or identification card in the victim's name but with another's

---

social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 16 C.F.R. §603.2(b).

[33] Alison Grace Johansen, 4 Lasting Effects of Identity Theft, NortonLifeLock (Mar. 13, 2018), https://www.lifelock.com/learn-identity-theft-resources-lasting-effects-of-identity-theft.html. (last visited Aug. 24, 2023).

[34] *Id.* (citing Identity Theft: The Aftermath 2016™, Identity Theft Resource Center (2016) https://www.idtheftcenter.org/images/page-docs/AftermathFinal_2016.pdf (last visited Aug. 24, 2023).

picture, fraudulently obtaining medical services, and/or using the victim's information to obtain a fraudulent tax refund.

72.    The United States government and privacy experts acknowledge that it may take much time for identity theft to come to light and be detected because identity thieves may wait years before using the stolen data.

73.    Because the information Defendant allowed to be compromised and taken is of such a durable and permanent quality, the harms to Plaintiffs and Class Members will continue and increase, and Plaintiffs and the Class Members will continue to be at substantial risk for further imminent and future harm.

## I.    Plaintiffs and Class Members Suffered Long-Lasting Damages

74.    The ramifications of Defendant's failure to keep Plaintiffs' and Class Members' Sensitive Information secure are long lasting and severe. Once Sensitive Information is stolen, fraudulent use of that information and damage to victims may continue for years.

75.    Fraudulent activity might not show up for prolonged periods of time—potentially years after the Sensitive Information is divulged to unauthorized third parties. Criminals often trade stolen PII and PHI on the "cyber black-market" for years following a breach. Cybercriminals can post stolen PHI on the internet, thereby making such information publicly available. These cybercriminals and other unauthorized third parties are now free to exploit and misuse that Sensitive Information without any ability for Plaintiffs and Class Members to recapture and erase the Sensitive Information from further dissemination. Plaintiffs' and Class Members' Sensitive Information is forever compromised, and this Sensitive Information was unique to the information that Defendant inadequately and improperly safeguarded.

76.     Approximately 21% of victims do not realize their identity has been compromised until more than two years after it has happened.[35] This gives thieves ample time to seek multiple treatments under the victim's name. Forty percent of consumers found out they were a victim of medical identity theft only when they received collection letters from creditors for expenses that were incurred in their names.[36]

77.     Healthcare-related data is among the most sensitive and personally consequential when compromised. A report focusing on health-care breaches found that the "average total cost to resolve an identity theft-related incident…came to about $20,000."[37] Further, a majority of the victims were forced to pay out-of-pocket costs for health care they did not receive in order to restore coverage. Moreover, almost 50% of the victims lost their health care coverage as a result of the incident, while nearly one-third said their insurance premiums went up after the event. Forty percent of the victims were never able to resolve their identity theft at all. Indeed, data breaches and identity theft have a crippling effect on individuals and detrimentally impact the entire economy as a whole.[38]

78.     As the FTC recognizes, identity thieves can use this PHI to commit an array of crimes including identity theft, and medical and financial fraud. Medical identity theft can result

---

[35] See Donna Parent, Medical ID Theft Checklist, IDENTITYFORCE (May 18, 2019), https://www.identityforce.com/blog/medical-id-theft-checklist-2. (last visited Aug. 24, 2023).

[36] The Potential Damages and Consequences of Medical Identity Theft and Healthcare Data Breaches, EXPERIAN (Apr. 2010), https://www.experian.com/assets/data-breach/whitepapers/consequences-medical-id-theft-healthcare.pdf. (last visited Aug. 24, 2023).

[37] Elinor Mills, Study: Medical identity theft is costly for victims, CNET (Mar. 3, 2010) https://www.cnet.com/tech/services-and-software/study-medical-identity-theft-is-costly-forvictims/. (last visited Aug. 24, 2023).

[38] *Id.*

in inaccuracies in medical records and costly false claims. It can also have life-threatening consequences. If a victim's health information is mixed with other records, it can lead to misdiagnosis or mistreatment. "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[39]

79.     The Sensitive Information belonging to Plaintiffs and Class Members is private and sensitive in nature and was left inadequately protected by Defendant who did not obtain Plaintiffs' or Class Members' consent to disclose their Sensitive Information to any other person as required by applicable law and industry standards. The Data Breach was a direct and proximate result of Defendant's failure to: (a) properly safeguard and protect Plaintiffs' and Class Members' Sensitive Information from unauthorized access, use, and disclosure, as required by various state and federal regulations, industry practices, and the common law; (b) establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiffs' and Class Members' Sensitive Information; and (c) protect against reasonably foreseeable threats to the security or integrity of such information.

80.     Had Defendant remedied the deficiencies in its data security system and adopted security measures and protocols recommended by experts in the field, and had Defendant not been negligent, Defendant would have prevented the Data Breach and, ultimately, the theft of Plaintiffs' and Class Members' Sensitive Information.

---

[39] Michael Ollove, "The Rise of Medical Identity Theft in Healthcare," KAISER HEALTH NEWS, (Feb. 7, 2014), https://khn.org/news/rise-of-indentity-theft/. (last visited Aug. 24, 2023).

81.     As a direct and proximate result of Defendant's wrongful actions and inaction, Plaintiffs and Class Members have been placed at an imminent, immediate, and continuing increased risk of harm from identity theft and identity fraud, requiring them to take the time which they otherwise would have dedicated to other life demands such as work and family in an effort to mitigate the actual and potential impact of the Data Breach on their lives. The U.S. Department of Justice's Bureau of Justice Statistics found that "among victims who had personal information used for fraudulent purposes, 29% spent a month or more resolving problems" and that "[resolving the problems caused by identity theft [could] take more than a year for some victims."[40]

82.     As a result of the Defendant's failure to prevent the Data Breach, Plaintiffs and Class Members have suffered, will suffer, or are at increased risk of suffering:

   a.  The compromise, publication, theft and/or unauthorized use of their Sensitive Information;

   b.  Unauthorized use and misuse of their Sensitive Information;

   c.  The loss of the opportunity to control how their Sensitive Information are used;

   d.  Out-of-pocket costs associated with the prevention, detection, recovery and remediation from identity theft or fraud;

   e.  Lost opportunity costs and lost wages and time associated with efforts expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts

---

[40]  Erika Harrell, Ph.D. and Lynn Langton, Ph.D., Victims of Identity Theft, 2012, DOJ, Off. of Just. Programs, Bureau of Just. Statistics (Dec. 2013), https://www.bjs.gov/content/pub/pdf/vit12.pdf. (last visited Aug. 24, 2023).

spent researching how to prevent, detect, contest and recover from identity theft and fraud;

f.  The imminent and certain impending injury flowing from potential fraud and identity theft posed by their Sensitive Information being placed in the hands of criminals;

g.  The continued risk to their Sensitive Information that is subject to further breaches so long as Defendant fails to undertake appropriate measures to protect the Sensitive Information in Defendant's possession; and

h.  Current and future costs in terms of time, effort and money that will be expended to prevent, detect, contest, remediate and repair the impact of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

83.  In addition to a remedy for the economic harm, Plaintiffs and the Class maintain an undeniable and continuing interest in ensuring that their Sensitive Information that remains in the possession of Defendant is secure, remains secure, and is not subject to further theft.

## ALLEGATIONS AS TO PLAINTIFF MELISSA BLACK

84.  Plaintiff Melissa Black ("Mrs. Black") has had a health plan administered by the Defendant since at least April 12, 2022. As a condition of the plan administration, Mrs. Black has provided her Sensitive Information to the Defendant, which was then entered in the Defendant's database.

85.  Based upon Exhibit A, Mrs. Black's Sensitive Information was shared by the Defendant with unknown third parties for purposes of which she had no knowledge until she received this Notice.

86.  Mrs. Black greatly values her Sensitive Information, especially when it comes to

protecting her health care information. Prior to the Data Breach, she took reasonable steps to maintain the confidentiality of her PII and to protect her PHI.

87. On or about August 22, 2023, Mrs. Black received Exhibit A. Exhibit A stated that "...We discovered that it is possible to unfilter the spreadsheet. If the spreadsheet was unfiltered, *it would reveal the information of other members contained in the claims report, including you…The personal information that may have been disclosed included your first and last name…a unique tracking ("cert") number, provider name, claim number, date of service…"*. *See* Exhibit A at p. 3.

88. Recognizing the present, immediate, and substantially increased risk of harm that Mrs. Black faces, Defendant advised her to obtain either a fraud alert or credit freeze on her credit reports. *Id.* at p. 2.

89. After receiving this Notice, Mrs. Black spent at least two hours checking her bank statements and financial accounts and has changed at least one password to those accounts.

90. The Data Breach has caused Mrs. Black to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has not been forthright with information about the Data Breach.

91. The Data Breach has caused Mrs. Black to suffer anxiety and stress that her Sensitive Information made public details about her health, which could be discerned by researching the provider's name that was disclosed in the Data Breach.

92. Mrs. Black plans on taking additional time-consuming, necessary steps to help mitigate the harm caused by the Data Breach, including continually reviewing her depository, credit, and other accounts for any unauthorized activity.

93. Additionally, Mrs. Black is very careful about sharing her PII. She has never

knowingly transmitted unencrypted PII over the internet or any other unsecured source.

94.     Mrs. Black stores any documents containing her PII in a safe and secure location or destroys the documents. Moreover, she diligently chooses unique usernames and passwords for her various online accounts.

95.     Mrs. Black has a continuing interest in ensuring that her PII, which, upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

## ALLEGATIONS AS TO PLAINTIFF MILES BLACK

96.     Plaintiff Miles Black ("Mr. Black") has had a health plan administered by the Defendant since at least April 12, 2022. As a condition of the plan administration, Mr. Black has provided his Sensitive Information to the Defendant, which was then entered in the Defendant's database.

97.     Based upon Exhibit A, Mr. Black's Sensitive Information was shared by the Defendant with unknown third parties for purposes of which he had no knowledge until he received this Notice.

98.     Mr. Black greatly values his Sensitive Information, especially when it comes to protecting his health care information.  Prior to the Data Breach, he took reasonable steps to maintain the confidentiality of his PII and to protect his PHI.

99.     On or about August 22, 2023, Mr. Black received Exhibit A.  Exhibit A stated that "...We discovered that it is possible to unfilter the spreadsheet.  If the spreadsheet was unfiltered, *it would reveal the information of other members contained in the claims report, including you…The personal information that may have been disclosed included your first and last name…a unique tracking ("cert") number, provider name, claim number, date of service…"*.  *See* Exhibit

A at p. 1.

100.    Recognizing the present, immediate, and substantially increased risk of harm that Mr. Black faces, Defendant advised him to obtain either a fraud alert or credit freeze on her credit reports. *Id.* at p. 2.

101.    After receiving this Notice, Mr. Black spent at least two hours checking his bank statements and financial accounts and has changed at least one password to those accounts.

102.    The Data Breach has caused Mr. Black to suffer fear, anxiety, and stress which has been compounded by the fact that Defendant has not been forthright with information about the Breach.

103.    The Data Breach has caused Mr. Black to suffer anxiety and stress that his Sensitive Information made public details about his health which could be discerned by researching the provider's name that was disclosed in the Data Breach.

104.    Mr. Black plans on taking additional time-consuming, necessary steps to help mitigate the harm caused by the Data Breach, including continually reviewing his depository, credit, and other accounts for any unauthorized activity.

105.    Additionally, Mr. Black is very careful about sharing his PII. He has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

106.    Mr. Black stores any documents containing his PII in a safe and secure location or destroys the documents. Moreover, he diligently chooses unique usernames and passwords for his various online accounts.

107.    Mr. Black has a continuing interest in ensuring that his PII, which, upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

<u>**CLASS ALLEGATIONS**</u>

108.    Plaintiffs bring this action on behalf of themselves and all other similarly situated

Class members pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure

and seek certification of the following Nationwide Class:

> **All persons who reside in the United States whose Sensitive Information**
> **was divulged by the Data Breach.**

109.    In addition, Plaintiffs bring this action on behalf of themselves and all other

similarly situated Class members pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of

Civil Procedure and seek certification of the following Florida Subclass:

> **All Florida residents whose Sensitive Information was divulged by the**
> **Data Breach.**

110.    Excluded from the class are Defendant and its subsidiaries and affiliates; all persons

who make a timely election to be excluded from the class; government entities; and the judge to

whom this case is assigned and his/her immediate family and court staff.

111.    Plaintiffs reserve the right to, after conducting discovery, modify, expand, or amend

the above Class definition or to seek certification of a class or Classes defined differently than

above before any court determines whether certification is appropriate.

112.    **Numerosity**. Consistent with Rule 23(a)(1), the members of the Class are so

numerous and geographically dispersed that joinder of all Class members is impracticable.

Plaintiffs believe that there are thousands of members of the Class, if not more. The number of

impacted individuals remains unknown and unreported, and Plaintiffs believe additional entities

and persons may have been affected by the Data Breach. The precise number of class members,

however, is unknown to Plaintiffs. Class members may be identified through objective means.

Class members may be notified of the pendency of this action by recognized, Court-approved

notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

113. **Commonality and Predominance.** Consistent with Fed. R. Civ. P. 23(a)(2) and with 23(b)(3)'s commonality and predominance requirements, this action involves common questions of law and fact which predominate over any questions affecting individual Class members. These common questions include, without limitation:

a. Whether Defendant violated the laws asserted herein;

b. Whether Defendant knew or should have known that its data environment and cybersecurity measures, or those created by corporate service providers, created a risk of a data breach;

c. Whether Defendant controlled and took responsibility for protecting Plaintiffs' and the Class's data when they solicited that data, collected it, stored it on its servers, and authorized a third party to collect and store that data;

d. Whether Defendant's security measures were reasonable considering the FTC data security recommendations, state laws and guidelines, industry standards, and common recommendations made by data security experts;

e. Whether Defendant owed Plaintiffs and the Class a duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the PII it collected, stored, and maintained from Plaintiffs and Class members;

f. Whether Defendant's failure to adequately secure Plaintiffs' and the Class' data constitutes a breach of its duty to institute reasonable security measures;

g. Whether Defendant's failure to implement reasonable data security measures allowed the breach of its data systems to occur and caused the theft of Plaintiffs' and the Class' data;

h. Whether reasonable security measures known and recommended by the data security community could have prevented the breach;

i. Whether Plaintiffs and the Class were injured and suffered damages or other losses because of Defendant's failure to reasonably protect its data systems; and

j. Whether Plaintiffs and the Class are entitled to damages and/or equitable relief.

114. **Typicality**. Consistent with Fed. R. Civ. P. 23(a)(3), Plaintiffs are typical members of the Class. Plaintiffs and the Class are each a person who provided data to AmeriBen, whose data resided on AmeriBen's servers, and whose personally identifying information was exposed in Defendant's Data Breach. Plaintiffs' injuries are similar to other class members and Plaintiffs seek relief consistent with the relief due to the Class.

115. **Adequacy**. Consistent with Fed. R. Civ. P. 23(a)(4), Plaintiffs are adequate representatives of the Class because Plaintiffs are members of the Class and are committed to pursuing this matter against Defendant to obtain relief for themselves and for the Class. Plaintiffs have no conflicts of interest with the Class. Plaintiffs have also retained counsel competent and experienced in complex class action litigation of this type, having previously litigated data breach cases. Plaintiffs intend to vigorously prosecute this case and will fairly and adequately protect the Class's interests.

116. **Superiority**. Consistent with Fed. R. Civ. P 23(b)(3), class action litigation is superior to any other available means for the fair and efficient adjudication of this controversy. Individual litigation by each Class member would strain the court system because of the numerous

members of the Class. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court. A class action would also permit customers to recover even if their damages are small as compared to the burden and expense of litigation, a quintessential purpose of the class action mechanism.

117. **Injunctive and Declaratory Relief**. Consistent with Fed. R. Civ. P. 23(b)(2), Defendant, through its conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the class as a whole.

## LEGAL CLAIMS

### COUNT I
### Negligence

118. Plaintiffs repeat and re-allege the allegations contained paragraphs 1-116 as if fully set forth herein.

119. Defendant collected, stored, used, and benefited from the Sensitive Information, which included nonpublic PII and PHI of Plaintiffs and Class Members, in the procurement and provision of healthcare benefits for Plaintiffs and Class Members.

120. Defendant had full knowledge of the sensitivity of the Sensitive Information and the types of harm that Plaintiffs and Class Members could and would suffer if the Sensitive Information was wrongfully disclosed.

121. By collecting, storing, and using Plaintiffs' and Class Members' Sensitive Information, Defendant owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, securing, deleting, protecting, and safeguarding the Sensitive Information. Defendant

owed a duty to prevent the Sensitive Information they received from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

122.    Defendant was required to prevent foreseeable harm to Plaintiffs and Class Members, and therefore had a duty to take adequate and reasonable steps to safeguard their Sensitive Information from unauthorized release or theft. This duty included: (1) designing, maintaining, and testing its data security systems, data storage architecture, and data security protocols to ensure Plaintiffs' and Class Members' Sensitive Information in its possession was adequately secured and protected; (2) implementing processes that would detect an unauthorized breach of its security systems and data storage architecture in a timely and adequate manner; (3) timely acting on all warnings and alerts, including public information, regarding its security vulnerabilities and potential compromise of the Sensitive Information of Plaintiffs and Class Members; and (4) maintaining data security measures consistent with industry standards and applicable federal and state laws and other requirements.

123.    Defendant had a common law duty to prevent foreseeable harm to Plaintiffs and Class Members. The duty existed because Plaintiffs and Class Members were the foreseeable and probable victims of any inadequate security practices of Defendant in its collection, storage, and use of Sensitive Information from Plaintiffs and Class Members. In fact, not only was it foreseeable that Plaintiffs and Class Members would be harmed by the failure to protect their Sensitive Information because malicious actors routinely attempt to steal such information for use in nefarious purposes, but Defendant also knew that it was more likely than not Plaintiffs and Class Members would be harmed as a result.

124.    Defendant's duties to use adequate and reasonable security measures also arose as a result of the special relationship that existed between it, on the one hand, and Plaintiffs and Class

Members, on the other hand. This special relationship arose because Defendant collected, stored, and used the Sensitive Information of Plaintiffs and Class Members for the procurement and provision of healthcare for Plaintiffs and Class Members. Defendant alone could have ensured that its security systems and data storage architecture were sufficient to prevent or minimize the Data Breach.

125.    Additionally, the policy of preventing future harm weighs in favor of finding a special relationship between Defendant and Plaintiffs and Class Members. If companies are not held accountable for failing to take adequate and reasonable security measures to protect the Sensitive Information in their possession, they will not take the steps that are necessary to protect against future security breaches.

126.    The injuries suffered by Plaintiffs and Class Members were proximately and directly caused by Defendant's failure to follow reasonable, industry standard security measures to protect Plaintiffs' and Class Members' Sensitive Information.

127.    When individuals have their personal information stolen, they are at substantial risk for imminent identity theft, and need to take steps to protect themselves, including, for example, buying credit monitoring services and purchasing or obtaining credit reports to protect themselves from identity theft.

128.    If Defendant had implemented the requisite, industry standard security measures and exercised adequate and reasonable care, data thieves would not have been able to take the Sensitive Information of Plaintiffs and Class Members.

129.    Defendant breached these duties through the conduct alleged here in this Complaint by, including without limitation, failing to protect the Sensitive Information in its possession; failing to maintain adequate computer systems and allowing unauthorized access to and

exfiltration of Plaintiffs' and Class Members' Sensitive Information; and failing to disclose the material fact that Defendant's computer systems and data security practices were inadequate to safeguard the Sensitive Information in its possession from theft.

130.     But for Defendant's wrongful and negligent breach of its duties owed to Plaintiffs and Class Members, their Sensitive Information would not have been compromised. And as a direct and proximate result of Defendant's failure to exercise adequate and reasonable care and use commercially adequate and reasonable security measures, the Sensitive Information of Plaintiffs and Class Members were accessed by ill-intentioned individuals who could and will use the information to commit identity or financial fraud. Plaintiffs and Class Members face the imminent, certainly impending, and substantially heightened risk of identity theft, fraud, and further misuse of their personal data.

131.     There is a temporal and close causal connection between Defendant's failure to implement security measures to protect the Sensitive Information of current and former patients and the harm suffered, or risk of imminent harm suffered, by Plaintiffs and Class Members.

132.     It was foreseeable that Defendant's failure to exercise reasonable care to safeguard the Sensitive Information in its possession or control would lead to one or more types of injury to Plaintiffs and Class Members. And the Data Breach was foreseeable given the known, high frequency of cyberattacks and data breaches in the healthcare industry.

133.     Plaintiffs and Class Members were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew of or should have known of the inherent risks in collecting and storing Sensitive Information, the critical importance of providing adequate security of Sensitive Information, the current cyber scams being perpetrated on Sensitive

Information, and that it had inadequate protocols, including security protocols in place to secure the Sensitive Information of Plaintiffs and Class Members.

134.    Defendant's own conduct created the foreseeable risk of harm to Plaintiffs and Class Members. Defendant's misconduct included its failure to take the steps and opportunities to prevent the Data Breach and its failure to comply with industry standards for the safekeeping and encrypted authorized disclosure of the Sensitive Information of Plaintiffs and Class Members.

135.    Plaintiffs and Class Members have no ability to protect their Sensitive Information that was and is in Defendant's possession. Defendant alone was and is in a position to protect against the harm suffered by Plaintiffs and Class Members as a result of the Data Breach.

136.    As a direct and proximate result of Defendant's negligence as alleged above, Plaintiffs and Class Members have suffered, will suffer, or are at increased risk of suffering:

    a.  The compromise, publication, theft and/or unauthorized use of their Sensitive Information;

    b.  The risk of public knowledge of their diagnosis(es) related to the exposure of the identities of their health care providers;

    c.  Unauthorized use and misuse of their Sensitive Information;

    d.  The loss of the opportunity to control how their Sensitive Information is used;

    e.  Out-of-pocket costs associated with the prevention, detection, recovery and remediation from identity theft or fraud;

    f.  Lost opportunity costs and lost wages and time associated with efforts expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts

spent researching how to prevent, detect, contest and recover from identity theft and fraud;

g.  The imminent and certain impending injury flowing from potential fraud and identity theft posed by their Sensitive Information being placed in the hands of criminals;

h.  The continued risk to their Sensitive Information that is subject to further breaches so long as Defendant fails to undertake appropriate measures to protect the Sensitive Information in Defendant's possession; and

i.  Current and future costs in terms of time, effort and money that will be expended to prevent, detect, contest, remediate and repair the impact of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

137.  Pursuant to the FTC Act, 15 U.S.C. § 45, Defendant had a duty to provide fair and adequate computer systems and data security measures to safeguard the Sensitive Information of Plaintiffs and Class Members.

138.  The FTC Act prohibits "unfair . . . practices in or affecting commerce," which the FTC has interpreted to include businesses' failure to use reasonable measures to protect Sensitive Information. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard. In addition, individual states have enacted statutes based upon the FTC Act that also created a duty.

139.  Defendant solicited, gathered, and stored Sensitive Information of Plaintiffs and Class Members to facilitate transactions which affect commerce.

140.  Defendant violated the FTC Act (and similar state statutes) and HIPAA, by failing to use reasonable measures to protect Sensitive Information of Plaintiffs and Class Members and

not complying with applicable industry standards, as described herein. Defendant's conduct was particularly unreasonable given the nature and amount of Sensitive Information obtained and stored and the foreseeable consequences of a data breach on Defendant's systems.

141.    Defendant's violations of the FTC Act (and similar state statutes) and HIPAA are evidence of negligence.

142.    Plaintiffs and Class Members are within the class of persons that the FTC Act (and similar state statutes) and HIPAA were intended to protect.

143.    The harm that occurred as a result of the Data Breach is the type of harm the FTC Act (and similar state statutes) and HIPAA were intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ adequate and reasonable data security measures caused the same harm as that suffered by Plaintiffs and Class Members.

144.    As a direct and proximate result of Defendant's violations of the above-mentioned statutes (and similar state statutes), Plaintiffs and Class Members have suffered, and continue to suffer, damages arising from the Data Breach as described herein and are entitled to compensatory, consequential, and punitive damages in an amount to be proven at trial.

## COUNT II
### Negligence Per Se

145.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1-116 as if fully set forth herein.

146.    Defendant's unreasonable data security measures constitute unfair or deceptive acts or practices in or affecting commerce in violation Section 5 of the FTC Act. The FTC Act requires businesses to institute reasonable data security measures and breach notification procedures, which Defendant failed to do.

147. Section 5 of the FTCA, 15 U.S.C. § 45, prohibits "unfair. . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by businesses like Defendant of failing to use reasonable measures to protect users' sensitive data. The FTC's complaint against Defendant also forms the basis of Defendant's duty.

148. Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect users' personally identifying information and sensitive data and by not complying with applicable industry standards. Defendant's conduct was particularly unreasonable given the sensitive nature and amount of data Defendant stored on its users and the foreseeable consequences of a Data Breach should Defendant fail to secure its systems.

149. Defendant's violation of Section 5 of the FTC Act constitutes negligence per se.

149. Defendant violated HIPAA regulations, including by:

- Failing to ensure the confidentiality and integrity of electronic PHI that Defendant creates, receives, maintains, and transmits, in violation of 45 C.F.R. section 164.306(a)(1);

- Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights, in violation of 45 C.F.R. section 164.312(a)(1);

- Failing to implement policies and procedures to prevent, detect, contain, and correct security violations, in violation of 45 C.F.R. section 164.308(a)(1);

- Failing to identify and respond to suspected or known security incidents and mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity, in violation of 45 C.F.R. section 164.308(a)(6)(ii);

- Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic PHI, in violation of 45 C.F.R. section 164.306(a)(2);

- Failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 C.F.R. section 164.306(a)(3);

- Failing to ensure compliance with HIPAA security standard rules by its workforce, in violation of 45 C.F.R. section 164.306(a)(4);

- Impermissibly and improperly using and disclosing PHI that is and remains accessible to unauthorized persons, in violation of 45 C.F.R. section 164.502, *et seq.*;

- Failing to effectively train all members of its workforce (including independent contractors) on the policies and procedures with respect to PHI as necessary and appropriate for the members of its workforce to carry out their functions and to maintain security of PHI, in violation of 45 C.F.R. sections 164.530(b) and 164.308(a)(5); and

- Failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard PHI in compliance with 45 C.F.R. section 164.530(c).

150. In addition, under state data security statutes, Defendant had a duty to implement and maintain reasonable security procedures and practices to safeguard Plaintiffs' and Class Members' PII.

151.    Defendant's violation of HIPAA, the FTC Act, and similar state statutes constitutes negligence per se.

152.    Plaintiffs and Class Members are within the class of persons these laws were intended to protect.

153.    The harm that has occurred is the type of harm these laws were intended to guard against. The FTC has pursued enforcement actions against businesses that, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and the Class.

154.    Defendant breached its duties to Plaintiffs and Class Members under these laws by failing to provide fair, reasonable, or appropriate computer systems and data security practices that complied with applicable industry standards to safeguard Plaintiffs' and Class Members' Sensitive Information.

155.    Plaintiffs and Class Members were foreseeable victims of Defendant's violations of these laws. Defendant knew or should have known that its failure to implement reasonable measures to protect and secure Plaintiffs' and Class Members' Sensitive Information that complied with applicable industry standards would cause damage to Plaintiffs and Class Members.

156.    But for Defendant's violation of the applicable laws and regulations, Plaintiffs' and Class Members' Sensitive Information would not have been accessed by unauthorized parties.

157.    As a direct and proximate result of Defendant's negligence per se, Plaintiffs and Class Members have been injured and are entitled to damages in an amount to be proven at trial. Such injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm;

the risk of public knowledge of their diagnosis(es) related to the exposure of the identities of their health care providers; loss of the value of their privacy and the confidentiality of the stolen PII; illegal sale of the compromised PII on illicit markets; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach reviewing bank statements, credit card statements, and credit reports, among other related activities; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of the Sensitive Information; the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of Defendant's Data Breach; lost benefit of their bargains and overcharges for services or products; nominal and general damages; and other economic and non-economic harm.

### COUNT III
### Breach of Contract

158.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1-116 as if fully set forth herein.

159.    Plaintiffs and Class Members entered into a valid and enforceable contract through which they were required to turn over their sensitive personal information to AmeriBen in exchange for services.

160.    That contract included promises by AmeriBen to secure, safeguard, and not disclose Plaintiffs' and Class Members' Sensitive Information to any third parties without their consent.

161.    AmeriBen's Privacy Policy memorialized the rights and obligations of AmeriBen and its customers. This document was provided to Plaintiffs and Class Members in a manner in which it became part of the agreement for services.

162.     In its Privacy Policy, AmeriBen commits to protecting the privacy and security of its members' Sensitive Information and promises to never share Plaintiffs' and Class Members' it except under certain limited circumstances.

163.     Plaintiffs and Class Members fully performed their obligations under their contracts with AmeriBen. However, AmeriBen failed to secure, safeguard, and/or keep private Plaintiffs' and Class Members' Sensitive Information, and therefore AmeriBen breached its contracts with Plaintiffs and Class Members.

164.     Defendant's failure to satisfy its confidentiality and privacy obligations, specifically those arising under the FTC Act, resulted in Defendant providing services to Plaintiffs and Class Members that were of a diminished value and in breach of its contractual obligations to Plaintiffs and Class Members.

165.     As a result, Plaintiffs and Class Members have been harmed, damaged, and/or injured as described herein, including by Defendant's failure to fully perform its part of the agreement with Plaintiffs and Class Members.

166.     As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members suffered and will continue to suffer damages in an amount to be proven at trial.

167.     In addition to monetary relief, Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to, inter alia, strengthen its data security monitoring and supervision procedures, conduct periodic audits of those procedures, and provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

## COUNT IV
## Breach of Implied Contract

168.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1-116 as if fully set forth herein.

169. This Count is pleaded in the alternative to Count III above.

170. Defendant provides third party administrative services to Plaintiffs and Class Members. Plaintiffs and Class Members formed an implied contract with Defendant regarding the provision of those services through its collective conduct, including by Plaintiffs and Class Members providing their Sensitive Information to Defendant in exchange for the services offered.

171. Through Defendant's offering of these services, it knew or should have known that it needed to protect Plaintiffs' and Class Members' confidential Sensitive Information in accordance with its own policies, practices, and applicable state and federal law.

172. As consideration, Plaintiffs and Class Members turned over valuable PII bargained with Defendant to securely maintain and store their Sensitive Information.

173. Defendant accepted possession of Plaintiffs' and Class Members' Sensitive Information for the purpose of providing services, including data security, to Plaintiffs and Class Members.

174. In delivering their Sensitive Information to Defendant in exchange for its services, Plaintiffs and Class Members intended and understood that Defendant would adequately safeguard their Sensitive Information as part of those services.

175. Defendant's implied promises to Plaintiffs and Class Members include, but are not limited to, (1) taking steps to ensure that anyone who is granted access to PII, including its business associates, vendors, and/or suppliers, also protect the confidentiality of that data; (2) taking steps to ensure that the Sensitive Information that is placed in the control of its business associates, vendors, and/or suppliers is restricted and limited to achieve an authorized business purpose; (3) restricting access to qualified and trained employees, business associates, vendors, and/or suppliers; (4) designing and implementing appropriate retention policies to protect the PII against

criminal data breaches; (5) applying or requiring proper encryption; (6) implementing multifactor authentication for access; (7) the risk of public knowledge of their diagnosis(es) related to the exposure of the identities of their health care providers; and (8) taking other steps to protect against foreseeable data breaches.

176.     Plaintiffs and Class Members would not have entrusted their Sensitive Information to Defendant in the absence of such an implied contract.

177.     Had Defendant disclosed to Plaintiffs and the Class that it did not have adequate data security and data supervisory practices to ensure the security of their sensitive data, Plaintiffs and Class Members would not have agreed to provide their Sensitive Information to Defendant.

178.     As providers of third-party administration servicing operations, Defendant recognized (or should have recognized) that Plaintiffs' and Class Member's Sensitive Information is highly sensitive and must be protected, and that this protection was of material importance as part of the bargain with Plaintiffs and the Class.

179.     Defendant violated these implied contracts by failing to employ reasonable and adequate security measures and supervision of its vendors, business associates, and/or suppliers to secure Plaintiffs' and Class Members' Sensitive Information.

180.     A meeting of the minds occurred, as Plaintiffs and Class Members agreed, *inter alia*, to provide their accurate and complete sensitive personal information to Defendant in exchange for Defendant's agreement to, *inter alia*, protect their Sensitive Information.

181.     Plaintiffs and Class Members have been damaged by Defendant's conduct, including the harms and injuries arising from the Data Breach now and in the future, as alleged herein.

<u>**COUNT V**</u>
**Breach of Fiduciary Duty**

182.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1-116 as if fully set forth herein.

183.    A relationship existed between Plaintiffs and Class Members and Defendant in which Plaintiffs and Class Members put their trust in Defendant to protect the Sensitive Information of Plaintiffs and Class Members and Defendant accepted that trust.

184.    Defendant breached the fiduciary duties that it owed to Plaintiffs and Class Members by failing to act with the utmost good faith, fairness, and honesty, failing to act with the highest and finest loyalty, and failing to protect the Sensitive Information of Plaintiffs and Class Members.

185.    Defendant's breach of fiduciary duty was a legal cause of damage to Plaintiffs and Class Members.

186.    But for Defendant's breach of fiduciary duty, the damage to Plaintiffs and Class Members would not have occurred.

187.    Defendant's breach of fiduciary duty contributed substantially to producing the damage to Plaintiffs and Class Members.

188.    As a direct and proximate result of Defendant's breach of fiduciary duty, Plaintiffs are entitled to and demand actual, consequential, and nominal damages and injunctive relief.

<u>**COUNT VI**</u>
**Unjust Enrichment/Quasi Contract**

189.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1-116 as if fully set forth herein.

190.     Plaintiffs and Class Members conferred a benefit on Defendant. Specifically, they provided Defendant with their Sensitive Information, which Sensitive Information has inherent value. In exchange, Plaintiffs and Class Members should have been entitled to Defendant's adequate protection and supervision of their Sensitive Information, especially in light of their special relationship.

191.      Defendant knew that Plaintiffs and Class Members conferred a benefit upon them and have accepted and retained that benefit by accepting and retaining the Sensitive Information entrusted to them. Defendant profited from Plaintiffs' retained data and used Plaintiffs' and Class Members' Sensitive Information for business purposes.

192.     Defendant failed to secure Plaintiffs' and Class Members' Sensitive Information and, therefore, did not fully compensate Plaintiffs or Class Members for the value that their Sensitive Information provided.

193.     Defendant acquired the Sensitive Information through inequitable record retention as it failed to disclose the inadequate data security practices, procedures, and protocols previously alleged.

194.     If Plaintiffs and Class Members had known that Defendant would not use adequate data security practices, procedures, and protocols to secure their Sensitive Information, they would have made alternative servicing choices that excluded Defendant.

195.     Under the circumstances, it would be unjust for Defendant to be permitted to retain any of the benefits that Plaintiffs and Class Members conferred upon them.

196.     As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and/or will suffer injury, including but not limited to: (i) the imminent and substantial risk of actual identity theft; (ii) the loss of the opportunity to control how their PII is

used; (iii) the compromise, publication, and/or theft of their Sensitive Information (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Sensitive Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their Sensitive Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect Sensitive Information in their continued possession; (vii) the risk of public knowledge of their diagnosis(es) related to the exposure of the identities of their health care providers; and (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Sensitive Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

197.    Plaintiffs and Class Members are entitled to full refunds, restitution, and/or damages from Defendant and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct alleged herein. This can be accomplished by establishing a constructive trust from which the Plaintiffs and Class Members may seek restitution or compensation.

198.    Plaintiffs and Class Members may not have an adequate remedy at law against Defendant, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

**COUNT VII**
**Declaratory and Injunctive Relief**

199.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1-116 as if fully set forth herein.

200.    Under the Declaratory Judgment Act, 28 U.S.C. §§2201, et seq., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as those alleged herein, which are tortious, and which violate the terms of the federal and state statutes described above.

201.    An actual controversy has arisen in the wake of the Data Breach at issue regarding Defendant's common law and other duties to act reasonably with respect to safeguarding the data of Plaintiffs and the Class. Plaintiffs allege Defendant's actions in this respect were inadequate and unreasonable and, upon information and belief, remain inadequate and unreasonable. Additionally, Plaintiffs and the Class continue to suffer injury due to the continued and ongoing threat of additional fraud against them or on their accounts.

202.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

    a.    Defendant owed, and continues to owe a legal duty to secure the sensitive personal information with which it is entrusted, specifically including information obtained from its customers, and to notify impacted individuals of the Data Breach under the common law, Section 5 of the FTC Act;

    b.    Defendant breached, and continues to breach, its legal duty by failing to employ reasonable measures to secure its customers' personal information; and

c.  Defendant's breach of its legal duty continues to cause harm to Plaintiffs and the Class.

203.  The Court should also issue corresponding injunctive relief requiring Defendant to employ adequate security protocols consistent with industry standards to protect its users' data.

204.  If an injunction is not issued, Plaintiffs and the Class will suffer irreparable injury and lack an adequate legal remedy in the event of another breach of Defendant's data systems. If another breach of Defendant's data systems occurs, Plaintiffs and the Class will not have an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages, while warranted to compensate Plaintiffs and the Class for their out-of-pocket and other damages that are legally quantifiable and provable, do not cover the full extent of injuries suffered by Plaintiffs and the Class, which include monetary damages that are not legally quantifiable or provable.

205.  The hardship to Plaintiffs and the Class if an injunction does not issue exceeds the hardship to Defendant if an injunction is issued.

206.  Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach, thus eliminating the injuries that would result to Plaintiffs, the Class, and the public at large.

## COUNT VIII
### Florida Deceptive and Unfair Trade Practices Act
### Fla. Stat. §§ 501.201, *et seq*.

207.  The Florida Plaintiffs identified above ("Plaintiff" for purposes of this Count), individually and on behalf of the Florida Subclass, repeats and realleges the factual allegations set forth in paragraphs 1-116 as if fully set forth herein.

208. Each of the Plaintiffs and Florida Subclass Members are "consumers" as defined by Fla. Stat. § 501.203.

209. Defendant advertised, offered, or sold goods or services in Florida and engaged in trade or commerce directly or indirectly affecting the people of Florida.

210. Defendant engaged in unconscionable, unfair, and deceptive acts and practices in the conduct of trade and commerce, in violation of Fla. Stat. § 501.204(1), including:

a. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiffs' and Class members' Sensitive Information, which was a direct and proximate cause of the Data Breach;

b. Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures in response to industry standards and best practices, which directly caused the Data Breach;

c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Class members' Sensitive Information, including duties imposed by the FTC Act and HIPAA, which directly caused the Data Breach;

d. Misrepresenting that Defendant would protect the privacy and confidentiality of Plaintiffs' and Class members' Sensitive Information, including by implementing and maintaining reasonable security measures, which directly caused the Data Breach;

e. Misrepresenting that Defendant would comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Class members' Sensitive Information, which directly caused the Data Breach;

     f.     Omitting, suppressing, and concealing the material facts that it did not reasonably or adequately secure or monitor its systems to prevent and detect unauthorized access, which directly caused the Data Breach.

211.    Defendant's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendant's data security and ability to protect the confidentiality of consumers' Sensitive Information.

212.    Had Defendant disclosed to Plaintiff and Subclass Members that its data systems were not secure and, thus, were vulnerable to attack, Defendant would have been unable to continue in business and it would have been forced to adopt reasonable data security measures and comply with the law. Defendant was trusted with sensitive and valuable Sensitive Information regarding millions of consumers, including Plaintiff and Subclass Members. Defendant accepted the responsibility of protecting the data but kept the inadequate state of its security controls secret from the public. Accordingly, Plaintiff and Subclass Members acted reasonably in relying on Defendant's misrepresentations and omissions, the truth of which they could not have discovered.

213.    As a direct and proximate result of Defendant's unconscionable, unfair, and deceptive acts and practices, Plaintiff and Florida Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, as described herein, including but not limited to fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; loss of value of their Sensitive Information; overpayment for Defendant's services; loss of the value of access to their Sensitive Information; the risk of public knowledge of their diagnosis(es) related to the exposure of the identities of their health care providers; and the value of identity protection services made necessary by the Data Breach.

214. Plaintiff and Florida Subclass Members seek all monetary and non-monetary relief allowed by law, including actual damages under Fla. Stat. § 501.211; declaratory and injunctive relief; reasonable attorneys' fees and costs, under Fla. Stat. § 501.2105(1); and any other relief that is just and proper.

## PRAYER FOR RELIEF

**WHEREFORE** Plaintiffs, on behalf of themselves and the Class, request that this Court award relief as follows:

A. An order certifying the class and designating Plaintiffs as the Class Representatives and the undersigned as Class Counsel;

B. An award to Plaintiffs and the proposed Class members of damages and equitable relief with pre-judgment and post-judgment interest;

C. A declaratory judgment in favor of Plaintiffs and the Class finding that the Defendant owed, and continue to owe a legal duty to secure the sensitive personal information with which it is entrusted, specifically including information obtained from its customers, and to notify impacted individuals of the Data Breach under the common law, the FTC Act, and HIPAA; that the Defendant breached, and continues to breach, its legal duty by failing to employ reasonable measures to secure its customers' personal information; and that the Defendant's breach of its legal duty continues to cause harm to Plaintiffs and the Class.

D. Injunctive relief to Plaintiff and the Class;

E. An award of attorneys' fees and costs as allowed by law; and

F. An award such other and further relief as the Court may deem necessary or appropriate.

G.   Costs and reasonable attorneys' fees as to Counts I through VIII; and

H.   Such other relief which this Court may deem appropriate.

## JURY DEMAND

Plaintiffs hereby respectfully demand a trial by jury on all such claims that may be so tried, with the maximum number of jurors permitted by law.

Dated: August 20, 2024        Respectfully submitted,

By:___/s/Bonner C. Walsh_____
       Bonner C. Walsh
       bonner@walshpllc.com
       Idaho State Bar Number 9646
       **WALSH PLLC**
       1561 Long Haul Road
       Grangeville, ID 83530
       Phone 541.359.2827
       Facsimile 866.503 8206
       Email: bonner@walshpllc.com

       Marc E. Dann*
       Brian D. Flick*
       Marita I. Ramirez*
       **DannLaw**
       15000 Madison Ave.
       Lakewood, OH 44107
       Phone: (216) 373-0539
       Facsimile: (216) 373-0536
       Email: notices@dannlaw.com

       Thomas A. Zimmerman, Jr.*
       Zimmerman Law Offices, P.C.
       77 W. Washington Street, Suite 1220
       Chicago, Illinois 60602
       (312) 440-0020 telephone
       (312) 440-4180 facsimile
       www.attorneyzim.com
       Email: firm@attorneyzim.com

       *Admitted pro hac vice

       *Attorneys for Plaintiffs Miles Black and Melissa Black and the putative Class*

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing Plaintiffs' First Amended Complaint and all Exhibits has been furnished to counsel for Defendant, via email only as listed below, this 20th day of August, 2024.

*Nicole C. Hancock at nicole.hancock@stoel.com*
*Kandi K. Hidde at khidde@fbtlaw.com*
*Darren A. Craig at dcraig@fbtlaw.com*

*/s/ Bonner C. Walsh*
Bonner C. Walsh
Co-Counsel for Plaintiffs and the putative Class